UNITED STATES DISTRICT COURT
for the
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLACKWELL PUBLISHING, INC., ELSEVIER, INC., MASSACHUSETTS MEDICAL SOCIETY, and WILEY-LISS, INC., <br><br> Plaintiffs, <br><br> v. <br><br> VIA MARKETING & PROMOTION, S.A. d/b/a ACTAMED SERVICES and ROBERT TH. GMELIG MEYLING, <br><br> Defendants. | Civil Action No.: <br> 1:05-CV-10697 WGY |

## PLAINTIFFS' SUR-REPLY MEMORANDUM CONCERNING FORUM NON CONVENIENS AND SUBJECT MATTER JURISDICTION

Plaintiffs Blackwell Publishing, Inc., Elsevier, Inc., Massachusetts Medical Society, and Wiley-Liss, Inc., submit this sur-reply in opposition to the motion of defendants VIA Marketing & Promotion, S.A. ("ActaMed") and Robert Th. Gmelig Meyling ("Meyling") to dismiss the Complaint on grounds of *forum non conveniens*, failure to state a claim upon which relief may be granted, and lack of subject matter jurisdiction. Plaintiffs submit this sur-reply to address two specific allegations made in defendants' reply brief on that topic: (1) that plaintiffs have somehow "manufactured" jurisdiction here, and (2) that Swiss law is critical to this case because of ActaMed's relationship with the Swiss entity known as ProLitteris.

1

1.    The "Manufactured Claims" Argument.

Defendants allege in their reply memorandum that plaintiffs' claims of U.S. infringement were "manufactured" in order to create jurisdiction here. The fact is that test orders such as those placed by Newjen on plaintiffs' behalf are common practice for copyright owners trying to police infringement of their rights. *Olan Mills, Inc. v. Linn Photo Co.*, 23 F.3d 1345 (8th Cir.1994); *Ryan v. CARL Corp.*, 23 F.Supp.2d 1146 (N.D.Cal.1998). They are a technique for proving the existence of systemic infringement. In fact, where systemic infringement clearly exists, test orders have even formed the basis for statutory damages, as in *Olan Mills*.

As plaintiffs have already pointed out in a different context, defendants' infringements have all been private transaction, not visible to the outside world. Absent pure luck, plaintiffs could never obtain proof of such transactions without first bringing suit. Under the circumstances, they probably could have sued here on information and belief alone, but they preferred to be able to show the Court specific proof of ActaMed's conduct. By placing test orders, plaintiffs were able to confirm their suspicions of ActaMed's conduct, and to prove that ActaMed was in fact delivering copies into the United States without plaintiffs' permission.

Would jurisdiction lie if the four test orders placed by Newjen were the only orders defendants ever filled for U.S. customers? Presumably, if a test order is actionable in and of itself, as found in *Olan Mills,* then such transaction can also form the basis for jurisdiction in and of itself. However, this interesting hypothetical argument need not concern us here. Although defendants try to suggest that the four instances of

infringement cited in plaintiffs' Complaint are "isolated" phenomena, nothing could be farther from the truth.

Meyling has said, in his first Declaration filed herein, that deliveries to the U.S. represent "less than one percent" of ActaMed's business. Plaintiffs accept that allegation for current purposes – but what does it mean in practice? Meyling coyly does not say what that percentage translates to in actual numbers, but plaintiffs have very recently come into possession of information that suggests the size of those numbers. *See* Affidavit of Dr. Peter Mosimann, submitted herewith. If ActaMed's US business represents only *one-half of one percent* of the business ActaMed conducted outside Switzerland, ActaMed has delivered some 122,500 pages into the United States. *Id.* at ¶ 7.

As Dr. Mosimann indicates, it is impossible to tell at this time how many of these pages were multiple copies of a given article, and how many were deliveries of single copies over the Internet. But one may engage in some rough calculations for purposes of discussion.

Articles in medical journals vary widely in length, but tend to be short given the density of their subject matter.[1] But if one were to assume a (probably generous) average length of seven pages per article across all of plaintiffs' journals, 122,500 pages could represent copying of more than 17,500 articles. Even if 90% of those 122,500

---

[1] For example, in the January 2001 issue of *Journal of Electrocardiology* (an Elsevier journal), articles range from four pages to fourteen; all but one are six pages or less in length. *See* Exhibit A hereto. The four articles identified in the Complaint range from four pages to seven pages. In two very recent issues of *The New England Journal of Medicine* (see cover page, in Exhibit A) the articles range in length from six pages to thirteen.

pages were bulk reprints rather than individually delivered articles, the number of articles infringed would still be roughly 1,750. This is no small number.

Thus, we are dealing here with a substantial volume of unauthorized deliveries into the United States, of which plaintiffs' four test orders are simply representative. There is no basis in either precedent or fact for denying that such orders form the legitimate basis of jurisdiction.

2.      The "Swiss Law" Argument.

In their reply brief and related papers, defendants finally make clear, or at least clearer, why they consider the Swiss organization ProLitteris to be relevant to their defense, and why they wish to drag Swiss law into this case. In their initial memorandum they made references to ProLitteris without explaining its nexus with this case. Now they say, at page 5 of their Reply:

> [T]his case actually is about actions of a Swiss company in Switzerland, informed by Swiss law, and acting within the terms of the Swiss Copyright Society [sic[2]] licensed by and acting under supervision of the Swiss Federal Institute for Intellectual Property.

This statement too is somewhat opaque, but at least it hints at defendants' proposed line of argument. It appears defendants intend to assert that they were acting under color of Swiss law by virtue of a relationship with ProLitteris. But even if such a relationship existed, it would avail defendants nothing.

Plaintiffs have submitted with this Sur-Reply the Affidavit of Ernst Hefti, CEO of ProLitteris. He explains that Article 19 of the Swiss copyright law allows

---

[2] In ¶9 of his first Declaration, Marco Rizzi had referred to ProLitteris as "the Swiss copyright society for literature and visual arts." So far as plaintiffs are aware or is relevant here, there is no "Swiss Copyright Society" as such.

4

private individuals and companies to make certain copies for their own use, and also allows commercial enterprises such as ActaMed to supply copies for such use. *Id.* at ¶ 2-5. ProLitteris is an agency established to administer this royalty scheme. *Id.* at ¶ 5. Article 19 does not by its terms appear to authorize any user beyond the boundaries of Switzerland to make copies in this manner, or have them made for it by a company such as ActaMed. Nevertheless, it appears that ActaMed paid fees to ProLitteris that purported to cover ActaMed's deliveries outside Switzerland as well as within Switzerland. Mosimann Declaration, ¶ 5. In other words, defendants allege that they paid copyright fees to ProLitteris pursuant to the Swiss statute, and that having done so they were authorized to deliver copies into the United States.

At first blush this may have the appearance of rationality. Boiled down, however, defendants' argument is that the government of Switzerland has the right to authorize the delivery of copies into other countries. ActaMed does not even appear to recognize how astonishing this claim really is.

In American jurisprudence the *lex loci delecti* is what governs in infringement actions.[3] The same is true under Swiss law, as the Second Declaration of Marco A. Rizzi states[4] – which makes ActaMed's suggestion that Swiss law excused its actions all the

---

[3] In *London Film Productions Ltd. v. Intercontinental Communications, Inc.*, 580 F. Supp. 47 (S.D.N.Y.1984), the court stated that the laws of Chile, Costa Rica, and Venezuela must govern the claims of infringement that occurred in each of those countries. The same principle guided the courts in *Boosey & Hawkes Music Publishers, Ltd. v. Walt Disney Co.*, 145 F.3d 481, 491 (2d Cir.1998), and *Armstrong v. Virgin Records, Ltd.*, 91 F. Supp.2d 628 (S.D.N.Y. 2000). *See also Bridgeman Art Library, Ltd. v. Corel Corp.*, 36 F.Supp.2d 191 (S.D.N.Y.1999).

[4] Article 110 of the Swiss Federal Act on International Private Law, attached as Exhibit 15 to Mr. Rizzi's Second Declaration, specifies that infringement will be judged according to the law of the state "with respect to which protection is requested," unless the parties agree to apply the "law of the place of the court."

more bizarre. If ActaMed were successful in having this case moved to Switzerland, it would be obliged to defend its US conduct under US law, not Swiss law.

This is not just a conflicts-of-laws issue. A much larger principle is at stake. The international copyright system would fall apart if each country could cloak its own nationals in copyright exemption and send them out into the world to do business.

The international copyright system, embodied in the Berne Convention, is built on the premise of "national treatment": that each country decides how much protection to grant to copyrights within its own borders (subject to certain minimum standards of protection), but that each country must extend that protection, whatever it may be, to the works of foreign authors on the same terms as to those of its own authors. *See generally* Geller and Nimmer, *International Copyright Law and Practice*, (Matthew Bender, 2004), §5[4][b].

The principle of national treatment is embodied in Article 5 of the Berne Convention, of which both the United States and Switzerland are members. Article 5 provides:

> Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this Convention
>
> ... [T]he extent of protection, as well as the means of redress afforded to the author to protect his rights, *shall be governed exclusively by the laws of the country where protection is claimed.*

*Id.*, paragraphs (1) and (2) (emphasis added).[5] The country where "protection is claimed" is the country where the infringement occurred. Geller and Nimmer,

---

[5] The full text of the Berne Convention may be found at, *e.g.*, Nimmer and Nimmer, *Nimmer on Copyright*, App. 27.

6

*International Copyright Law and Practice*, §3[1][a][i]-[ii]. There is thus no basis in law or logic for arguing that Swiss law can govern the legality of the importation of copies into, and distribution of copies within, the United States.

Defendants' attempt to invoke Swiss law and ProLitteris in their defense is particularly surprising given that over five years ago ProLitteris' own counsel expressly advised ProLitteris, and ProLitteris expressly advised its customers including ActaMed, that the statutory license under Article 19 of the Swiss copyright law did *not* extend to delivery of copies outside of Switzerland. *See* Hefti Declaration at ¶ 7, 8. In fact, as of January 1, 2002, ActaMed did not even have a license in place with ProLitteris, *id.* at ¶ 9, though it apparently continued to send money to ProLitteris as if it did. In light of this, the good faith of defendants in protesting their reliance on ProLitteris and Swiss law must frankly be open to question.

Be that as it may, Swiss law has no bearing on this case and defendants' attempt to argue to the contrary is groundless.

                    Respectfully submitted,

                    BLACKWELL PUBLISHING, INC.,
                    ELSEVIER, INC.,
                    MASSACHUSETTS MEDICAL
                    SOCIETY, and
                    WILEY-LISS, INC.,
                    Plaintiffs,

                    By their attorneys,

                    /s/ William S. Strong
Dated: September 1, 2005      William S. Strong, Esq., BBO #483520
                    Amy C. Mainelli, Esq., BBO# 657201
                    KOTIN, CRABTREE & STRONG, LLP

                                            One Bowdoin Square
                                            Boston, MA 02114
                                            (617) 227-7031
                                            (617) 367-2988 (fax)

## **CERTIFICATE OF SERVICE**

I, Amy C. Mainelli certify that I have this day served the foregoing document by e-mail upon counsel for the defendants in this action.


September 1, 2005                /s/ Amy C. Mainelli
Date


WSS/elsevier/actamed/Sur-reply

Case 1:05-cv-10697-WGY    Document 19-2    Filed 09/01/2005    Page 1 of 5

# JOURNAL OF Electrocardiology

Official Journal of the International Society for Computerized Electrocardiology and the International Society of Electrocardiology



Volume 34 • Number 1 • January 2001

Churchill Livingstone®
A Harcourt Health Sciences Company

# Journal of Electrocardiology  *Volume 34 Number 1 2001*

1  Electrical Conduits Within the Inferior Atrial Region Exhibit Preferential Roles in Interatrial Activation
*Huabin Sun and Dirar S. Khoury*

15  Spectral Analysis of Epicardial 60-Lead Electrograms in Dogs With 4-Week-Old Myocardial Infarction
*Yukio Hosoya, Kozue Ikeda, Takashi Komatsu, Michiyasu Yamaki, and Isao Kubota*

25  A Placebo Controlled Evaluation of the Antifibrillatory Effects of Carvedilol
*Jianlin Xie, Alisha Dunn, James P. Tsikouris, Yanliang Sun, Chengde Fan, Jeffrey Kluger, Moses S. S. Chow, and C. Michael White*

31  Paradoxial Behavior of PR Interval Dynamics During Exercise and Recovery and its Relationship to Cardiac Memory at the Atrioventricular Node
*Federico Moleiro, Francesca Misticchio, Ivan Mendoza, Ana Rodriguez, Agustin Castellanos, and Robert J. Myerburg*

35  Autonomic Influences on Ventricular Repolarization in Congestive Heart Failure
*Denis Pellerin, Pierre Maison-Blanche, Fabrice Extramiana, Jean-Sylvain Hermida, Jean-Francois Leclercq, Antoine Leenhardt, and Philipe Coumel*

41  Standards for the Function of an Academic 12-Lead Electrocardiographic Core Laboratory
*Stanley T. Anderson, Olle Pahlm, Ljuba Bacharova, Alejandro Barbagelata, Bernard R. Chaitman, Peter Clemmensen, Shaun Goodman, Bo Hedén, Peter J. Klootwijk, Michael Lauer, Peter W. MacFarlane, Pentti Rautaharju, Shankara Reddy, Ronald H. Selvester, Elena B. Sgarbossa, Donald Underwood, Robert A. Warner, and Galen S. Wagner*

49  **EDITORIAL**
Prevention of Atrial Fibrillation by Multisite Atrial Pacing
*S. Serge Barold*

53  Patterns of Acute Inferior Wall Myocardial Infarction Caused by Hyperkalemia
*Juan A. Pastor, Agustin Castellanos, Federico Moleiro, and Robert J. Myerburg*

59  Double Ventricular Response Via Dual Atrioventricular Nodal Pathways Resulting With Nonreentrant Supraventricular Tachycardia and Successfully Treated With Radiofrequency Catheter Ablation
*Kojiro Nakao, Motonobu Hayano, Ivan I. Iliev, Yoshiyuki Doi, Satoki Fukae, Kiyotaka Matsuo, Norihiro Komiya, Shojiro Isomoto, and Katsusuke Yano*

(Continued)

65  Syncope in Patients With Atrial Flutter During Treatment With Class Ic Antiarrhythmic Drugs
    *Mihoko Kawabata, Kenzo Hirao, Tomoe Horikawa, Kou Suzuki, Katsuhiko Motokawa, Fumio Suzuki, Kouji Azegami, and Kazumasa Hiejima*

73  Mental Stress-Induced Myocardial Ischemia in Association With a Myocardial Bridge
    *Julián Ortega-Carnicer, Alfonso Ambrós, and María Luisa Gómez-Grande*

77  Reverse Use-Dependent QT Prolongation During Infusion of Nifekalant in a Case of Recurrent Ventricular Tachycardia With Old Myocardial Infarction
    *Tsuyoshi Shiga, Sonoko Ando, Tsuyoshi Suzuki, Naoki Matsuda, and Hiroshi Kasanuki*

81  Apparent Bradycardia-Dependent Right Bundle Branch Block Associated With Atrial Fibrillation: Concealed Electrotonic Conduction as a Possible Mechanism
    *Shinji Kinoshita, Takakazu Katoh, Yoshinori Tsujimura, and Yoshihiko Sasaki*

87  **LETTER TO THE EDITOR**
    ST-Segment Elevation in Leads $V_1$–$V_3$ in Patients With LBBB
    *John E. Madias, Anjan Sinha, Himanshu Agarwal, and Ramin Ashtiani*

89  **LETTER TO THE EDITOR**
    Heart Rate Variability and QT Dispersion in Mitral Valve Prolapse
    *Tsung O. Cheng*

# The NEW ENGLAND JOURNAL of MEDICINE

VOL. 353 NO. 5

ESTABLISHED IN 1812        AUGUST 4, 2005        WWW.NEJM.ORG



450  THIS WEEK IN THE JOURNAL

**PERSPECTIVE**

441  Public Solicitation of Organ Donors   R. Steinbrook
444  The Ethics of Organ Donation by Living Donors
     R.D. Truog
447  Risks and Benefits to the Living Donor
     J.R. Ingelfinger

**ORIGINAL ARTICLES**

451  West Nile Virus among Blood Donors
     in the United States, 2003 and 2004
     S.L. Stramer and Others

460  Screening the Blood Supply for West Nile Virus RNA
     by Nucleic Acid Amplification Testing
     M.P. Busch and Others

468  The Prognostic Value of a Nomogram
     for Exercise Capacity in Women
     M. Gulati and Others

476  Modafinil for Excessive Sleepiness
     Associated with Shift-Work Sleep Disorder
     C.A. Czeisler and Others

**REVIEW ARTICLES**

487  Drug Therapy: Adherence to Medication
     L. Osterberg and T. Blaschke

498  Current Concepts: Diagnosis from the Blood Smear
     B.J. Bain

**IMAGES IN CLINICAL MEDICINE**

508  Medical Mystery — Abdominal Pain
     K.M. Kim and R.I. Kopelman

**CLINICAL PROBLEM-SOLVING**

509  A Fractured Diagnosis
     T. Cukierman and Others

**EDITORIALS**

516  Problem Solved? West Nile Virus
     and Transfusion Safety
     L.R. Petersen and J.S. Epstein

517  Where Does Fitness Fit In?
     W.E. Kraus and P.S. Douglas

519  Shift-Work Sleep Disorder — The Glass Is
     More Than Half Empty
     R.C. Basner

**CLINICAL IMPLICATIONS OF BASIC RESEARCH**

522  An Aggrecanase and Osteoarthritis
     G. Karsenty

524  **CORRESPONDENCE**
     Screening for the Lynch Syndrome
     *Chlamydia pneumoniae* and Acute Coronary Syndrome
     Histone Deacetylase Activity and COPD
     Nephrogenic Syndrome of Inappropriate Antidiuresis
     MRSA in the Community
     Transatlantic Spread of the USA300 Clone of MRSA

528  CORRECTION
534  BOOK REVIEWS
537  CONTINUING MEDICAL EDUCATION

Owned & published by the MASSACHUSETTS MEDICAL SOCIETY © 2005.
All rights reserved. ISSN 0028-4793.

003

# The NEW ENGLAND JOURNAL of MEDICINE

VOL. 353   NO. 4

ESTABLISHED IN 1812          JULY 28, 2005          WWW.NEJM.ORG



340   THIS WEEK IN THE JOURNAL

**PERSPECTIVE**
329   Bar Coding for Patient Safety   A.A. Wright and I.T. Katz
331   Straight from the Shoulder   J. Halamka
333   Making Antimalarial Agents Available in Africa
      K.J. Arrow, H. Gelband, and D.T. Jamison
335   Making Antimalarial Agents Available
      in the United States   A. Magill and C. Panosian
337   Studying Herbal Remedies   W. Sampson

**ORIGINAL ARTICLES**
341   Echinacea angustifolia in Rhinovirus Infections
      R.B. Turner and Others
349   Perioperative Beta-Blocker Therapy and Mortality
      after Major Noncardiac Surgery
      P.K. Lindenauer and Others
362   Brief Report: PML after Natalizumab Therapy
      for Crohn's Disease
      G. Van Assche and Others
369   Brief Report: PML after Natalizumab and Interferon
      Beta-1a for Multiple Sclerosis
      B.K. Kleinschmidt-DeMasters and K.L. Tyler
375   Brief Report: PML in a Patient Treated
      with Natalizumab
      A. Langer-Gould and Others

**SPECIAL ARTICLE**
382   Children with Discontinuous Insurance Coverage
      L.M. Olson, S.S. Tang, and P.W. Newacheck

**CLINICAL PRACTICE**
392   Cervical Radiculopathy
      S. Carette and M.G. Fehlings

**IMAGES IN CLINICAL MEDICINE**
400   Bilateral Pulmonary-Artery Aneurysms
      in Behçet's Syndrome
      S. Lohani and R. Niven
e4    Transcatheter Treatment of Thromboembolism
      in the Superior Mesenteric Artery
      A. Nishida and K. Fukui

**CASE RECORDS OF THE MASSACHUSETTS GENERAL HOSPITAL**
401   A Man with a Mass in the Liver
      K.K. Tanabe and Others

**EDITORIALS**
412   Beta-Blocker Therapy in Noncardiac Surgery
      D. Poldermans and E. Boersma
414   PML and Natalizumab
      J.R. Berger and I.J. Koralnik
417   Patients at Risk
      J.M. Drazen
418   Insurance and the U.S. Health Care System
      B. Starfield

420   **CORRESPONDENCE**
      Effectiveness of Antimalarial Drugs
      Respiratory Syncytial Virus Infection in Elderly Adults
      Treatment of Mild Asthma
      Hyponatremia in Marathon Runners
      Inflammation, Atherosclerosis, and Coronary Disease
      Physician as Serial Killer
      Medical Mystery: Bradycardia — The Answer
      Natalizumab and PML

434   **BOOK REVIEWS**
437   **CONTINUING MEDICAL EDUCATION**

Owned & published by the MASSACHUSETTS MEDICAL SOCIETY © 2005.
All rights reserved. ISSN 0028-4793.