## UNITED STATES DISTRICT COURT
### for the
### DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLACKWELL PUBLISHING, INC.,<br>ELSEVIER, INC.,<br>MASSACHUSETTS MEDICAL SOCIETY,<br>and<br>WILEY-LISS, INC.,<br><br>     Plaintiffs,<br><br>     v.<br><br>VIA MARKETING & PROMOTION, S.A.<br>d/b/a ACTAMED SERVICES and<br>ROBERT TH. GMELIG MEYLING,<br><br>     Defendants. | Civil Action No.: 1:05-CV-10697 WGY |

## FIRST AMENDED COMPLAINT

This is an action for infringement of copyrights belonging to plaintiffs, in violation of Title 17 of the U.S. Code and the laws of other countries. This First Amended Complaint is filed pursuant to the Court's order entered orally at the hearing on September 14, 2005.

Plaintiffs complain of defendant as follows:

### Parties

1.   Plaintiff Blackwell Publishing, Inc. ("Blackwell") is a Delaware corporation having its principal place of business at 350 Main Street, Malden, Massachusetts 02148. It is engaged in the business of publishing books and journals in medicine and other fields, including but not limited to the journal identified in this action.

1

2.   Plaintiff Elsevier, Inc. ("Elsevier") is a business corporation organized and existing under the laws of New York, and having a place of business at 30 Corporate Drive, Suite 400, Burlington, Massachusetts 01803.  It is engaged in the business of publishing scholarly books and journals in medicine and other fields, including but not limited to the journal specifically identified in this action.

3.   Plaintiff Massachusetts Medical Society is a non-profit corporation organized under the laws of the Commonwealth of Massachusetts and having its principal place of business at 860 Winter Street, Waltham Woods Corporate Center, Waltham, MA 02451. Founded in 1781, it is the oldest continuously operating medical society in the United States. It is also one of the world's leading publishers of medical research and other medical information, including but not limited to the journal specifically identified in this action.

4.   Plaintiff Wiley-Liss Inc. ("Wiley") is a business corporation organized and existing under the laws of Delaware and having its principal place of business at 111 River Street, Hoboken, New Jersey  07030.  It is engaged in the business of publishing journals in medicine and other fields, including but not limited to the journal specifically identified in this action.

5.   Defendant VIA Marketing & Promotion, S.A. d/b/a ActaMed Services ("ActaMed") is, according to plaintiffs' information and belief, a corporation having its principal place of business at Via Pastura 74, 6983 Magliaso, Switzerland.  Upon information and belief, ActaMed has a second business address at Via Chiosso 15, 6948 Porza TI, Switzerland.  It is engaged in, *inter alia*, the business of reproducing and distributing, for profit, upon request of individuals and entities throughout the United

2

States and elsewhere, material published and owned by others including but not limited to the plaintiffs in this action.

6.   Defendant Robert Th. Gmelig Meyling ("Gmelig Meyling") is, according to plaintiffs' information and belief, an individual residing at Via Pastura 74, 6983 Magliaso Switzerland, and the President and CEO of defendant ActaMed. As such he has the right, power, and authority to direct the activities of defendant ActaMed and has a direct financial interest in the copyright infringement described in this Complaint.

## Jurisdiction and Venue

7.   This Court has jurisdiction over the claims of this Complaint that arise from violation of Title 17 of the U.S. Code, pursuant to 28 U.S.C. §1338(a), and pendant jurisdiction over the remaining claims raised herein as they are based on the same nucleus of operative facts.

8.   This Court also has jurisdiction over the non-federal claims of this Complaint under 28 U.S.C. §1332, because there is complete diversity of citizenship of the parties and the amount in controversy exceeds the sum of $75,000.

9.   This Court has personal jurisdiction over the defendants through their contact and business transactions within the state, including without limitation the delivery into Massachusetts of the documents identified in this action.

10.   Venue is appropriate in this Court under 28 U.S.C.§1400(a).

## Facts

11. Plaintiff Blackwell publishes medical books and journals that are sold throughout the world. Among its journals is one entitled *Seminars in Dialysis*.

12. Plaintiff Elsevier publishes medical books and journals that are sold throughout the world. Among its journals is one entitled *American Journal of Cardiology*.

13. Plaintiff Massachusetts Medical Society publishes *The New England Journal of Medicine,* the world's premier journal of general medicine, which is sold throughout the world.

14. Plaintiff Wiley publishes medical journals that are sold throughout the world. Among its journals is one entitled *Depression and Anxiety*.

15. The journals identified above are sometimes collectively referred to in this Complaint as "Plaintiffs' Journals."

16. All of Plaintiffs' Journals are edited by noted scholars in their respective fields. The content of Plaintiffs' Journals consists primarily of peer-reviewed articles in those fields. Each article is written by one or more scientists, generally though not exclusively on the basis of original research.

17. Each plaintiff, as a matter of standard practice, requires that the scientists who contribute articles to its publications assign all copyrights for all countries of the world in those articles to the publisher. This enables each plaintiff to seek out the greatest number of markets for the journal concerned and for its contents, thereby maximizing dissemination of the article.

18. Specifically, but without limitation of the foregoing, plaintiffs have, in connection with their respective journals, secured transfers of copyright from the authors of the articles listed on <u>Exhibit A</u> to this Complaint. The copyrights thus transferred are those involved in Counts 1-8, *infra*, of this Complaint.

4

19.  Plaintiffs invest heavily in their journal publishing programs.  Each year they incur substantial costs for support of the editorial offices of their Journals, for copyediting and proofreading, and for typesetting, layout, printing, binding, distribution, and promotion.

20.  The revenue from publication and other reproduction of Plaintiffs' Journals is a significant portion of plaintiffs' annual revenues and therefore critical to their financial health.

21.  Plaintiffs risk serious financial injury if their copyrights are not respected.  A substantial decline in their journal income could cause plaintiffs to cease publication of one or more journals.  This would have an adverse impact on the scholarly community and on scientific progress, by making it more difficult to publish worthwhile scientific research.

22.  Defendant ActaMed operates a service that provides, on demand, copies of individual articles from journals.  Companies engaged in this business are known in the marketplace as "document delivery services."

23. ActaMed's Internet website, located at www.actamed.ch, describes the various types of services it offers.   Generally, a registered customer is able to order copies of any individual articles from the journals included in ActaMed's "Online Library".  This "library" is essentially a database in which articles from many of plaintiffs' journals are stored in PDF format.  Plaintiffs never authorized the making and storage of these PDF copies of their articles.

24. ActaMed also operates an on-line service known as ActaMed ImiCard, available only to registered physicians, allowing them to obtain copies of articles from

ActaMed's Online Library.  Plaintiffs are informed and believe that only "sponsored"

physicians are able to register for such service.  Sponsored physicians are chosen by, and

their use of ImiCard is paid for by, the pharmaceutical industry because they are

specialists in a certain area, and they receive articles and medical information from

ActaMed geared towards that specialty.  Plaintiffs are informed and believe that ActaMed

offers document delivery through ImiCard of the same publications that it offers through

ActaMed.  See Exhibit B attached hereto.

25. In addition, ActaMed offers a "Special Selection" service that allows

customers to order articles published in "50 important medical/scientific journals" and a

"Literature Service" service that allows physicians to receive thematically updated

overviews of articles. Defendants have informed Plaintiffs that such Literature Service is

paid for entirely or primarily by the pharmaceutical industry.  Plaintiffs are informed and

believe that ActaMed offers document delivery in both print and PDF format through

both of these services, of the same publications that it offers through its "Online Library".

See Exhibits C and D attached hereto.

26.  In the recent past, plaintiffs discovered that ActaMed was delivering

copyrighted materials into the United States by Internet transmission, and doing so

without obtaining permission from the owners of copyright in such materials.  In order to

document the existence of such activity, plaintiffs asked an independent party – Newjen

Corporation, of Fitchburg, Massachusetts ("Newjen") - to test ActaMed's compliance

with copyright by ordering from ActaMed copies of articles from Plaintiffs' Journals.

27. Over a period of several months preceding the filing of this Complaint, Newjen, at plaintiffs' request, placed online orders for various articles from Plaintiffs' Journals with ActaMed.

28. After receiving Newjen's orders, and without requesting or receiving permission from any of the plaintiffs, ActaMed made and delivered to Newjen, in PDF format via e-mail, a copy of each article requested by Newjen.

29. The articles from Plaintiffs' Journals that ActaMed thus copied and delivered are listed on Exhibit A hereto. Copies of the respective first pages of these articles, as printed from the Adobe Acrobat "PDF" files delivered by ActaMed, are attached hereto as, collectively, Exhibit E.

30. In addition, Newjen placed an order for 300 reprints of an article entitled "Preimplantation diagnosis for sonic hedgehog mutation causing familial holoprosencephaly" from the *New England Journal of Medicine*, Volume 348, Issue 15, to be shipped into the United States and delivered to Newjen's business address in Massachusetts. Reprints are bulk copies of articles, typically offered as a marketing device. For example, a pharmaceutical company might order 1,000 copies of an article that reported favorably on its product, which the pharmaceutical company would then distribute to physicians.

31. In response to Newjen's order, Actamed reproduced and delivered to Newjen, via UPS, 300 copies of the requested article from the *New England Journal of Medicine* without requesting or receiving permission from the Massachusetts Medical Society.

32. Plaintiffs Blackwell, Elsevier, Massachusetts Medical Society and Wiley have registered copyright in the issues of each respective journal in which such articles

were published. The registration number applicable to each article appears on Exhibit A in the last column corresponding to each article.

33. Plaintiffs believe, on the basis of the foregoing, that ActaMed routinely responds to document copy requests for material from journals published by plaintiffs, in the same manner as described above, and that it has made hundreds or thousands of unauthorized copies of such material and delivered them into the United States.

34. Plaintiffs are informed and believe that ActaMed routinely fills similar orders from countries other than the United States, in the same manner as described above, and that ActaMed has made hundreds or thousands of unauthorized copies of such material and delivered them into or within countries other than the United States.

35. Prior to the fulfillment of Newjen's orders, Swiss counsel acting on behalf of the plaintiffs and certain other publishers had advised ActaMed that its activities violated copyright laws both within Switzerland and abroad. In continuing to conduct its business as described herein, and in delivering the unauthorized copies identified herein, ActaMed was acting with willful disregard for plaintiffs' copyrights.

36. As part of the ordering process, ActaMed asks customers to agree to "Conditions for Document Delivery", attached hereto as Exhibit F. With respect to reprint orders, customers are asked to agree to the same Conditions and an additional "Proposal", such as that attached hereto as Exhibit G. Both the Conditions and Proposal suggest a copyright fee has been paid and the Proposal specifically states that ActaMed has paid the copyright fee due. However, ActaMed has never paid any copyright fees to plaintiffs for the activities described in this Complaint, and has never sought plaintiffs' permission for such activities.

37. Plaintiffs do permit document delivery with respect to articles from their journals. In the United States, such permission can be obtained over the Internet, and the fees for such permission are openly published. The copyright fees that plaintiffs would have charged ActaMed, had ActaMed sought permission for the copying and distribution to Newjen described herein, would have exceeded the fees that ActaMed charged Newjen. Therefore, copyright fees cannot possibly have been taken into account by ActaMed in computing its own fees.

38. Furthermore, ActaMed could not have obtained the right from plaintiffs to deliver documents in PDF format without specific contractual authorization, because plaintiffs treat PDF delivery as a special case requiring various contractual safeguards. Plaintiffs have never given ActaMed such authorization. Indeed, the contracts that plaintiffs have with ActaMed specifically forbid any commercial distribution whatsoever.

39. Plaintiffs have suffered substantial monetary harm from ActaMed's unauthorized copying. Plaintiffs will continue to suffer monetary harm if ActaMed is permitted to continue its infringing activities. In addition, if ActaMed is permitted to continue copying material from plaintiffs' copyrighted publications, plaintiffs will suffer ongoing injury that cannot be quantified in money damages.

40. As President and CEO of ActaMed, defendant Gmelig Meyling has authorized and directed, and is responsible for, the unlawful activities described herein, and derives direct financial benefit from such copying.

ON THE BASIS OF THE FOREGOING, plaintiffs sue defendants under the following counts:

## COUNTS 1- 4

### Copyright Infringement – Unauthorized Distribution within the United States

41.  Defendants have infringed copyright in each of the articles numbered 1 through 4 on Exhibit A by causing such article to be distributed electronically within the United States, and in the case of Article number 3 by causing such article to be physically distributed within the United States, without permission of the plaintiff copyright owner, in violation of the copyright owner's right under 17 U.S.C. §106(3).  The infringement of each separate article is a separate count in this Complaint.

42.  Plaintiffs are informed and believe that defendants have in like manner infringed other copyrights owned by plaintiffs, the identification of which will be determined in the course of discovery.

## COUNTS 5 - 8

### Copyright Infringement – Unauthorized Importation into the United States

43.  Defendants have infringed copyright in each of the articles numbered 1 through 4 on Exhibit A by causing such article to be electronically imported, and in the case of Article 3 physically imported, into the United States without permission of the plaintiff copyright owner, in violation of the copyright owner's right under 17 U.S.C. §602.  The infringement of each separate article is a separate count in this Complaint (the count number for unauthorized importation being the count number for unauthorized distribution plus 4).

44. Plaintiffs are informed and believe that defendants have in like manner infringed other copyrights owned by plaintiffs, the identification of which will be determined in the course of discovery.


## COUNT 9

### Copyright Infringement Within Countries Other Than the United States

45. Based on the evidence stated above, plaintiffs are informed and believe that defendants are engaged in reproduction, distribution, issuing to the public, importation, communication to the public, and/or making available to the public, of works or copies of works the identify of which is not yet known to plaintiffs, in and to countries other than the United States, without permission and in violation of plaintiffs' rights under the laws of those several countries.

46. All plaintiffs are domiciled within the United States and are entitled to relief from this Court on account of such infringement.

47. The identification of the works infringed and the countries where plaintiffs' rights have been violated will be determined in the course of discovery.


WHEREFORE plaintiffs pray that this Honorable Court:

A. Issue a preliminary order enjoining defendants, their officers, agents, servants, employees, and attorneys, and all those in active concert with them or participation with them, from all further importation into, distribution within, and display within, the United States or elsewhere, by any means or method, of contents from the books,

journals, or other publications published by plaintiffs or any of them, during the pendency of this litigation, without appropriate authorization;

B.  Issue an order permanently enjoining defendants, their officers, agents, servants, employees, and attorneys, and all those in active concert with them or participation with them, from all further importation into, distribution within, and display within, the United States, by any means or method, of contents from the books, journals, or other publications published by plaintiffs or any of them, without appropriate authorization;

C.  Award plaintiffs statutory damages for defendants' infringement and willful infringement in the maximum amount permitted by law, or in the alternative where applicable all of their direct and consequential damages arising from defendants' infringement of copyright;

D.  Award plaintiffs an accounting of defendants' profits from infringement;

E.  Award plaintiffs their reasonable attorneys' fees, costs of suit and interest; and

F.  Award plaintiffs such other and further relief as the Court deems just and proper.

BLACKWELL PUBLISHING, INC.,
ELSEVIER, INC.,
MASSACHUSETTS MEDICAL
SOCIETY, and
WILEY-LISS, INC.,
Plaintiffs,

By their attorneys,


Dated: September 20, 2005

/s/ Amy C. Mainelli
William S. Strong, Esq., BBO #483520
Amy C. Mainelli, Esq., BBO# 657201
KOTIN, CRABTREE & STRONG, LLP
One Bowdoin Square
Boston, MA 02114
(617) 227-7031
(617) 367-2988 (fax)

WSS/elsevier/actamed/first amended complaint

# KOTIN, CRABTREE & STRONG, LLP

ATTORNEYS AT LAW

ONE BOWDOIN SQUARE

BOSTON, MASSACHUSETTS 02114-2925

LAWRENCE KOTIN
ROBERT K. CRABTREE
WILLIAM S. STRONG*
DOLPH J. VANDERPOL
ABBOTT L. REICHLIN
ANNE L. JOSEPHSON
JOSEPH B. GREEN
MARIE F. MERCIER
ELIZABETH J. BAILEY
NICHOLAS M. KELLEY
RENÉ D. VARRIN
SHAREN LITWIN
EILEEN M. HAGERTY
DANIEL T.S. HEFFERNAN

*ALSO ADMITTED IN NH

TELEPHONE (617) 227-7031

FACSIMILE (617) 367-2988

EMAIL KCS@KCSLEGAL.COM

WWW.KCSLEGAL.COM

AMY H. WEINSTEIN
LAUREL H. SIEGEL
SHERRY L. RUSCHIONI
AMY C. MAINELLI**

**ALSO ADMITTED IN RI

September 20, 2005

Clerk
U.S. District Court for
The District of Massachusetts
John Joseph Moakley U.S. Courthouse
One Courthouse Way
Boston, MA 02210

Re:    Blackwell Publishing, Inc., et al. v. VIA Marketing & Promotion, S.A. d/b/a
ActaMed Services and Robert Th. Gmelig Meyling
Civil Action No. 05 cv 10697 WGY

Dear Sir or Madam:

In a hearing that took place on September 14, 2005, the Honorable Judge William G. Young ordered that plaintiffs amend their complaint to include the amount in controversy. Assuming the filing of a Motion to Amend the Complaint is unnecessary, attached please find Plaintiffs' First Amended Complaint pursuant to said Order.

As discussed in Plaintiffs' Opposition to Defendants' Motion to Dismiss on Grounds of *Forum Non Conveniens*, Failure to State a Claim and Lack of Subject Matter Jurisdiction, filed with the Court on July 19, 2005, plaintiffs have also included an assertion of pendant jurisdiction.

Thank you for your assistance. Please contact me with any questions.

Yours sincerely,

Amy C. Mainelli

Enclosures
cc:    John Cotter, Esq.
William S. Strong, Esq.

| Count No. | Publisher | Authors | Title | Journal | Article Details | Copyright Reg'n No. |
|---|---|---|---|---|---|---|
| 1 | Blackwell Publishing, Inc. | Ross | Do not resuscitate orders and iatrogenic arrest during dialysis: Should "No" mean "No"? | Seminars in Dialysis | Vol. 16, No. 5 (September 2003) pp. 395-398 | TX 5-879-544 |
| 2 | Elsevier, Inc. | Blankenship JC, Hellkamp AS, Aguirre FV, Demko SL, Topol EJ, Califf RM. | Vascular access site complications after percutaneous coronary intervention with abciximab in the Evaluation of c7E3 for the Prevention of Ischemic Complications (EPIC) trial. | American Journal of Cardiology | Vol. 81, No. 1 (January 1998) pp. 36-40 | TX 4-598-749 |
| 3 | Massachusetts Medical Society | Verlinsky Y, Rechitsky S, Verlinsky O, Ozen S, Sharapova T, Masciangelo C, Morris R, Kuliev A. | Preimplantation diagnosis for sonic hedgehog mutation causing familial holoprosencephaly. | New England Journal of Medicine | Vol. 348, No. 15 (April 2003) pp. 1449-54 | TX 5-783-866 |
| 4 | Wiley-Liss, Inc. | Hensley PL, Nadiga D, Uhlenhuth EH. | Long-term effectiveness of cognitive therapy in major depressive disorder. | Depression and Anxiety | Vol. 20, No.1 (January 2004) pp. 1-7 | TX 6-075-993 |



❯ **Home**

❯ **Company profile**

▽ **Service profile**

   ImiCard

   Literature Service

   Online Library Special

   Update Online

❯ **My Account**

❯ **Basket**

❯ **Links**

❯ **Contact**

## ActaMed® ImiCard (International Medical Information Card)

ActaMed® ImiCard is available for registered physicians, allowing them to quickly obtain a full copy of any scientific medical article published world-wide.

Registered doctors can search in the ActaMed® Online Library, which contains a continuously updated overview of the most important articles published in more than 7'000 medical journals. The powerful search engine of the ActaMed® Online Library allows FULL-TEXT searching and with the ActaMed® ImiCard Online, physicians can directly download article copies of their choice.

The ActaMed® ImiCard has 2 versions:
The ActaMed® ImiCard Standard and the ActaMed® ImiCard Special. Both versions include:

- A personalised ImiCard;
- Access to the ActaMed® Online Library;
    - The ActaMed® Online Library contains more than 425'000 full text articles.
    - Daily more than 600 new articles are inserted in the ActaMed® Online Library.
    - Searching on title and abstract AND full text on the TOTAL content of the ActaMed® Online Library;
    The powerful search engine enables:
        - A simple search on citation (any words, exact phrase, author, year, etc.);
        - An advanced search inserting MeSH categories;
        - Journal search: year, issue, author or combinations; has all the features of the advanced search;
- A copy of any article in the ActaMed® Online Library can be requested;
- Instant download of the full text article copy in PDF;
- Information leaflet in the local language with user instructions for the ImiCard.


The ActaMed® ImiCard Special has 2 extra features:

- Simultaneously searching in the ActaMed® Online Library and PubMed. Results of both searches are shown separately or

integrated. Integrated search results give you the opportunity to receive a full text article copy from the ActaMed® Library immediately;
- Article copies not available in the ActaMed® Online Library can be purchased online.


The ActaMed® ImiCard is accessible to registered users.

More than 150'000 doctors use the ActaMed® Services.

If you want more information about this service or if you wish to subscribe, please contact us at:info@actamed.ch


VIA Marketing & Promotion SA |  Copyright Information  |  Legal statement  |  info@actamed.ch



▷ **Home**

▷ **Company profile**

▽ **Service profile**

   ImiCard

   Literature Service

   Online Library Special

   Update Online

▷ **My Account**

▷ **Basket**

▷ **Links**

▷ **Contact**

## ActaMed® Literature Service

This Service offers a regular overview of the most important articles recently published in the medical world literature.

ActaMed® Literature Service is accessible to registered users only. Registered physicians have at their disposal a continuously, thematically updated overview of the most important articles published world-wide in more than 7'000 medical journals. The ActaMed® Literature Service is available in print- and online version.

**ActaMed® Literature Service Print Version**

The ActaMed® Literature Service is sent by mail to the target group on a regular basis;

- Each doctor can request full text article copies of his choice by returning the reply-card;

**Details of the ActaMed® Literature Service Online**

- All titles/abstracts of all issues are published in a separate database on the ActaMed® website;
- Physicians can search on their own keywords;
- Searching on title and abstract AND full text on the TOTAL Theme based content of the ActaMed® Online Library. The powerful search engine enables:
  - A simple search on citation, "such as", "sound as", author, year etc.;
  - An advanced search inserting MeSH categories;
  - Journal search: year, issue, author or combinations; has all the features of the advanced search;

Request of full text article copy:

Online version:

- Instant download of the full text article copy in PDF;
- Instant e-mail delivery;

Print version:

- All printed article copies are watermarked with the ActaMed® logo;

- The requested article copies are dispatched by mail;

More than 150.000 doctors use the ActaMed® Services.

If you want more information about this service or if you wish to subscribe, please contact us at: info@actamed.ch

VIA Marketing & Promotion SA |  Copyright Information  |  Legal statement  |  info@actamed.ch



▷ **Home**

▷ **Company profile**

▽ **Service profile**

   ImiCard

   Literature Service

   Online Library Special

   Update Online

▷ **My Account**

▷ **Basket**

▷ **Links**

▷ **Contact**

### The ActaMed® Online Library: "Special Selection" more than 100.000 full text articles

ActaMed® Online Library " Special Selection":

- The ActaMed® Online Library "Special Selection"covers 50 important medical/scientific journals. On a biweekly basis the database is updated with citations and abstracts of newly published articles.
- The ActaMed® Online Library "Special Selection"contains more than 100.000 copies of full text articles.
- Biweekly more than 1000 new articles are inserted in the ActaMed® Online Library "Special Selection".
- Search on title and/or abstract AND full text on the TOTAL content of the ActaMed® Online Library "Special Selection". The powerful search engine enables:
  - A simple search on citation, "such as", "sound as", author, year etc.
  - An advanced search inserting MeSH categories.
  - Journal search: year, issue, author or combinations hereof; has all the features of the advanced search.
- Search results appear similar to PubMed and can be defined by the searcher.
- Using the ActaMed® Online Library "Special Selection" you must agree with the conditions for document delivery and comply with the regulations regarding copyrights.
- Specific articles can be added; prices upon request.
- The ActaMed® website can be incorporated in the Sponsor's website through a dynamic link: the "Look and Feel" of the ActaMed® Online Library "Special Selection" is flexible.

Download of article copies in PDF:

- Instant download of the full text article copy.
- Instant email delivery.

Leaflet with "instructions of use" of the ActaMed® Online Library "Special Selection", to instruct in a professional way, each doctor will receive a leaflet in the local language, which explains adequately the use of the ActaMed® Online Library "Special Selection".

The ActaMed® Services are in line with the EU directive 2001/83.

More than 150'000 doctors use the ActaMed® Services!

VIA Marketing & Promotion SA |  Copyright Information  |  Legal statement  |  info@actamed.ch



### Ethical Issues in Dialysis
Aaron Spital, Series Editor

# Do Not Resuscitate Orders and Iatrogenic Arrest During Dialysis: Should "No" Mean "No"?

Lainie Friedman Ross

Department of Pediatrics and MacLean Center for Clinical Medical Ethics, University of Chicago, Chicago, Illinois

## ABSTRACT

An iatrogenic arrest is a cardiopulmonary arrest induced by a therapeutic effort. Frequently cardiopulmonary arrests during hemodialysis (HD) are iatrogenic. In this article I consider the question of what to do when a cardiopulmonary arrest occurs during HD in a patient with a do not resuscitate (DNR) order. I consider and reject four arguments to override the DNR order: the principle of nonmaleficence, the efficacy of resuscitation, proximate cause, and physician error. Instead, I argue that respect for patient autonomy and patient goals means that DNR orders must be respected unless there is compelling evidence that overriding the DNR would be consistent with the patient's goals. If such evidence is lacking, the physician has no moral choice but to follow the DNR order literally. As such, nephrologists need better communication with their patients regarding advance care planning and better documentation of their communication once it has occurred.

In 2001, Moss et al. (1) noted that "there is a lack of consensus in the nephrology community about what to do when cardiopulmonary arrest occurs during the course of a hemodialysis treatment" in a patient with a do not resuscitate (DNR) order. They noted that some dialysis units are willing to respect a patient's DNR order, but that other units believe that cardiopulmonary resuscitation (CPR) should always be provided if a patient arrests while undergoing dialysis.

The good news for dialysis units is that the problem is relatively uncommon because 1) cardiac arrests during dialysis are uncommon (Karnik et al. (2) reported that 400 cardiac arrests occurred during 5,744,708 hemodialysis [HD] sessions—a rate of 7 arrests per 100,000 treatments); and 2) most dialysis patients want CPR (studies have found between 76% and 86% of HD patients want resuscitation (1,3–5)). In this article I examine the question of what should be done when cardiopulmonary arrest occurs during HD in a patient with a DNR order when the arrest may be iatrogenic.

## Efficacy of CPR in Patients with End-Stage Renal Disease

To optimize discussions about how to handle a cardiac arrest, accurate information regarding prognosis is necessary. Cardiac disease is the major cause of death in dialysis patients, accounting for about 45% of deaths (6). Almost half of these deaths are due to "cardiac arrest, cause unknown," and about 20% are attributed to acute myocardial infarction (7). Survival after cardiopulmonary arrest in individuals with end-stage renal disease (ESRD) is poor. Ebell et al. (8) performed a meta-analysis of arrests in all hospitalized patients. They found that immediate survival after in-hospital CPR was 40.7% and the rate of survival to discharge was 13.4% (8). ESRD was associated with an even lower rate of survival to discharge (8,9), with estimates of survival at less than 10% (9–11). However, as noted by Moss et al. (10), data on CPR outcomes in HD patients specifically (rather than all patients with ESRD) are limited. In one small study Tzamaloukas et al. (12) found that CPR outcomes were highly dependent on the location of arrest, and that in 6 of 12 arrests in the dialysis unit, CPR was successful.

## Can We Simply Follow Patient Preferences for CPR?

The solution as to what should be done in the event of a cardiac arrest during dialysis should be simple: follow the patient's directive. But it is not so simple. First, only 6–35% of chronic dialysis patients have completed

Address correspondence to: Lainie Ross, MD, PhD, Department of Pediatrics, University of Chicago, 5841 S. Maryland Ave., MC 6082, Chicago, IL 60637, or e-mail: lross@uchicago.edu.

Seminars in Dialysis—Vol 16, No 5 (September–October) 2003 pp. 395–398

ActaMed® Library

DEPRESSION AND ANXIETY 20:1–7 (2004)

# Theoretical Review

# LONG-TERM EFFECTIVENESS OF COGNITIVE THERAPY IN MAJOR DEPRESSIVE DISORDER

Paula L. Hensley, M.D.,* Deepa Nadiga, M.D., and E.H. Uhlenhuth, M.D.

*Cognitive therapy of depression, based on the cognitive theory of depression, is an established treatment for major depressive disorder. Although few clinicians expect acute treatment of depression with antidepressant medication to prevent long-term relapse of the illness, some practitioners of cognitive therapy report long-term effectiveness in preventing relapse after short-term treatment. We set out to reanalyze follow-up studies in the literature, using intent-to-treat principles to assess the long-term effects of acute treatment with cognitive therapy. From an initial reference list of 97 citations that met our search criteria (controlled clinical trials of cognitive therapy in depression with follow-up), we found five trials that met our inclusion criteria. This report reviews and reanalyzes these five trials, published between 1981 and 1992, which compare cognitive therapy and tricyclic antidepressant therapy. Overall, the evidence favors a longer-term effect for cognitive therapy over tricyclic antidepressants alone. Depression and Anxiety 20:1–7, 2004. © 2004 Wiley-Liss, Inc.*

**Key words:** *adult; antidepressive agents; cognitive therapy; depressive disorder; follow-up studies*

## INTRODUCTION

The efficacy of antidepressant medication in the treatment of major depressive disorder (MDD) has been established by multiple clinical trials. Joining the older generation of antidepressants (tricyclic antidepressants, TCAs; monoamine oxidase inhibitors, MAOIs), the selective serotonin reuptake inhibitors (SSRIs) emerged in the late 1980s and 1990s to dominate the antidepressant market. Although response rates are defined differently in different studies, the short-term clinical efficacy of antidepressants ranges around 70% [Rosenbaum and Hylan, 1999]. At the same time that novel antidepressants were coming to market, interest in psychotherapeutic treatments of depression has increased. Long-term psychoanalytic treatment is rare. Manual-based psychotherapeutic approaches such as the cognitive psychotherapy of Beck [1967] and the interpersonal psychotherapy of Klerman et al. [1984] are the current psychotherapeutic treatments of choice.

Although the efficacy of antidepressant treatment for depression has been demonstrated repeatedly in randomized double-blind clinical trials [Mulrow et al., 2000], the efficacy of cognitive therapy (CT), particularly for more severely depressed patients, is less well defined [Gloaguen et al., 1998]. Published data on CT

for depression show greater variation than we see in the data on antidepressants. Although many trials show rates of acute response similar to those seen in antidepressant trials, there remain questions about the efficacy of CT for more severely depressed patients. Many authors claim a durable benefit of CT, a protective effect against further episodes of depression after treatment discontinuation. In other words, proponents of CBT assert that it is effective in relapse prevention.

If CT were protective against depressive relapse, it would clearly offer advantages over antidepressants, which no one assumes protect against relapse once stopped. But how was the common belief of a

Department of Psychiatry, School of Medicine, University of New Mexico Health Sciences Center, Albuquerque, New Mexico

*Correspondence to: Dr. Paula L. Hensley, University of New Mexico Department of Psychiatry, 2400 Tucker NE, 4th Floor, Albuquerque, NM 87131. E-mail: phensley@salud.unm.edu

Received for publication 15 December 2003; Accepted 1 June 2004

DOI: 10.1002/da.20022
Published online 19 August 2004 in Wiley InterScience (www.interscience.wiley.com).

© 2004 WILEY-LISS, INC.

# Vascular Access Site Complications After Percutaneous Coronary Intervention With Abciximab in the Evaluation of c7E3 for the Prevention of Ischemic Complications (EPIC) Trial

James C. Blankenship, MD, Anne S. Hellkamp, MS, Frank V. Aguirre, MD, S. Lee Demko, RN, Eric J. Topol, MD, and Robert M. Califf, MD, for the EPIC Investigators

Thrombolytic therapy or intense anticoagulation during percutaneous transluminal coronary revascularization (PTCR) increases the risk of vascular access site complications. This study evaluated the association of abciximab, a glycoprotein IIb/IIIa receptor blocker, with vascular access site complications after PTCR. Of 2,058 patients who underwent PTCR in the Evaluation of c7E3 for the Prevention of Ischemic Complications (EPIC) trial, major vascular access site bleeding (a drop in hematocrit > 15%), minor vascular access site bleeding (> 10% drop), or surgical repair of the access site occurred in 5%, 12%, and 1.4% of all patients, respectively. Minor and/or major bleeding or surgery occurred in 21.8% of abciximab patients, compared with 9.7% of placebo patients (p <0.001). Logistic regression analysis identified these predictors of minor and/or major bleeding and/or surgical repair, in descend-

ing order of importance: abciximab therapy, acute myocardial infarction at enrollment, high baseline hematocrit, time in catheterization laboratory, heavier weight, female gender, maximum in catheterization laboratory-derived clotting time, and age (all p <0.05). Vascular access site complications increased median post-PTCR length of stay from 2 days (for bleeding) to 3 days (minor bleeding) and 6 days (major bleeding). Site-to-site variation in vascular access site complications varied six-fold. Analyses of subsequent studies of PTCR with abciximab will determine whether discontinuing heparin and removing sheaths soon after PTCR reduces the risk of vascular access site complications. ©1998 by Excerpta Medica, Inc.

(Am J Cardiol 1998;81:36–40)

**V**ascular access site complications of percutaneous transluminal coronary revascularization (PTCR) have been described for angioplasty,[1–6] and more recently for new devices, including atherectomy and stenting.[7–13] The most common vascular access site complications are hematomas accompanied by significant blood loss and arterial pseudoaneurysms or arteriovenous fistulas requiring surgery. The incidence for these range from 3% to 5% for simple angioplasty interventions.[11,12] Vascular access site complications are important because they may double the length of stay and hospital costs associated with coronary intervention,[12] and can cause patient discomfort and even death. In recent studies, the only consistent procedural predictor of vascular access site complications was the intensity and duration of anticoagulant therapy during and after the intervention.[1–4] Fibrinolytic drug use during the procedure has also increased the rate of vascular access site complications.[7,8,15] New antiplate-

let drugs such as abciximab may have similar effects. While abciximab, a glycoprotein IIb/IIIa receptor blocker, decreased complications of high-risk PTCR in the Evaluation of c7E3 for the Prevention of Ischemic Complications (EPIC) trial,[16] bleeding complications were 2 to 3 times more frequent in patients receiving abciximab compared with placebo.[17,18] This study prospectively analyzes the collected data on vascular access site complications in patients undergoing PTCR with abciximab.

## METHODS

Between November 1991 and November 1992, the 56-center EPIC trial enrolled 2,099 patients undergoing coronary angioplasty or directional atherectomy with high-risk clinical or angiographic characteristics.[16] Patients were eligible if they were at high risk for vessel closure (with either acute myocardial infarction, angina at rest, or angiographic characteristics indicating high risk). Patients >79 years old were excluded. Aspirin (325 mg) was given ≥2 hours before PTCR and daily afterward. Intravenous heparin (10,000 to 12,000 U) was given before the procedure; subsequent doses of 3,000 U were given to achieve an activated clotting time of 300 to 350 seconds before and during the intervention. Heparin infusion was continued at 1,000 U/hour after the procedure (target activated partial thromboplastin time >60 seconds or

From the Geisinger Medical Center, Danville, Pennsylvania; the Duke Clinical Research Institute, Durham, North Carolina; the St. Louis University Medical Center, St. Louis, Missouri; and the Cleveland Clinic Foundation, Cleveland, Ohio. Manuscript received May 21, 1997; revised manuscript received and accepted September 24, 1997.

Address for reprints: James C. Blankenship, MD, Department of Cardiology, Geisinger Medical Center, Danville, Pennsylvania 17822.

36    ©1998 by Excerpta Medica, Inc.
All rights reserved.

0002-9149/98/$19.00
PII S0002-9149(97)00796-0

*The* NEW ENGLAND JOURNAL *of* MEDICINE

## BRIEF REPORT

# Preimplantation Diagnosis for Sonic Hedgehog Mutation Causing Familial Holoprosencephaly

Yury Verlinsky, Ph.D., Svetlana Rechitsky, Ph.D., Oleg Verlinsky, M.S.,
Seckin Ozen, M.D., Tatyana Sharapova, M.S., Christina Mascmangelo, M.S.,
Randy Morris, M.D., and Anver Kuliev, M.D., Ph.D.

THE SONIC HEDGEHOG (*SHH*) GENE IS A HUMAN HOMOLOGUE OF THE drosophila gene encoding inductive signals involved in patterning the early embryo and which is highly functionally conserved in many species.[1] The gene was mapped to chromosome 7 (7q36), the locus for the gene involved in holoprosencephaly (HPE3).[2] SHH mutations may cause the failure of cerebral hemispheres to separate into distinct left and right halves, leading to holoprosencephaly, which is one of the most common developmental anomalies of the forebrain and midface in humans.[3] Although the majority of cases of holoprosencephaly are sporadic, familial cases are not rare, with a clear pattern of autosomal dominant inheritance.

There is great clinical variability of holoprosencephaly within families, ranging from alobar holoprosencephaly and cyclopia to cleft lip and palate, microcephaly, ocular hypotelorism, and even to a normal phenotype. This variability suggests an interaction between SHH and other genes expressed during craniofacial development and the possible involvement of environmental factors. Because almost one third of carriers of SHH mutations may be clinically unaffected, even in affected families, the prenatal detection of SHH mutations might not justify termination of the pregnancy. Preimplantation genetic diagnosis is thus a more attractive option for couples at risk for having a child with holoprosencephaly.

We describe the use of preimplantation genetic diagnosis for SHH mutation in a family with holoprosencephaly. The use of this technique, followed by confirmation of mutation-free status by amniocentesis, resulted in the birth of a healthy girl.

From the Reproductive Genetics Institute, Chicago. Address reprint requests to Dr. Kuliev at 2825 N. Halsted St., Chicago, IL 60657, or at anverkuliev@hotmail.com.

N Engl J Med 2003;348:1449-54.
*Copyright © 2003 Massachusetts Medical Society.*

## CASE REPORT

A couple who had had two children with clinical signs of holoprosencephaly presented for preimplantation genetic diagnosis (Fig. 1). Their second child, a girl with severe holoprosencephaly and cleft lip and palate, died shortly after birth. The results of chromosomal analysis of peripheral-blood lymphocytes from this child and the parents were normal. However, DNA analysis of samples obtained at autopsy showed that the girl had an SHH nonsense mutation — a change from GAG to TAG — leading to the premature termination of the protein at position 256 of exon 3 (Glu256stop)[3] (Fig. 2A). SHH protein is an intercellular signaling molecule. This precursor is cleaved internally into a highly conserved domain (SHH-N) with signaling activity and a more divergent domain (SHH-C), which in addition to precursor processing, acts as an intramolecular cholesterol transferase crucial for proper patterning activity in animal development.[1] Although the effect on SHH function of the nonsense mutation identified in the child is unknown, the resulting protein may not have the expected signaling function in early morphogenesis.[1,3]

Conditions for Document Delivery

1. All documents supplied are for private study only.
2. Only one copy of a document may be supplied per person and this copy may not be copied, sold or transferred to any other third party.
3. Payment of a copyright fee does not give permission to make further copies from items supplied by VMP/ActaMed® Services
4. The supplied copy may not be given to any other third party without written authorisation.
5. Electronically supplied documents may be printed only once and may not be transferred to any other third party.
6. In several countries it is forbidden to store electronically supplied documents permanently in a retrieval system. In this case the electronically supplied document must be deleted within 5 working days from receipt.
7. VMP/Actamed® Services stores all data related to a request, which will be used for statistical purposes only.
8. Ordering documents from the ActaMed® Database & Library implies the acceptance of all above mentioned conditions for document delivery.



**NEWJEN  CORP.**
**12 Baltic Ln.**
**Fitchburg MA 01420**
**USA**

### Kind attn.: Mr. William Jennings

Our ref.:BG/SC/ROW/05.0267                          Porza, 22nd February 2005

*Subject: ActaMed® Copy Service Extra*

Dear Mr. Jennings,

We thank you for your request for the ActaMed® Copy Service Extra. We have the pleasure to submit you our proposal for the ActaMed® Copy Service Extra.

**Details of the ActaMed® Copy Service Extra:**
• Laser printed copies on 100 grams paper;
• Copies are laser printed in black & white;
• Format A3 folded to A4 with 2 staples;
• Minimum order quantity: 250 copies per article copy;
• Administration and handling fee per article copy is included;
• Shrink-Wrapping in packages of 25 copies included.

**1.The requested article copy:**

| | |
|---|---|
| Author(s): | Verlinsky Y, Rechitsky S, Verlinsky O, Ozen S, Sharapova T, Masciangelo C, Morris R and Kuliev A. |
| Title: | Preimplantation diagnosis for sonic hedgehog mutation causing familial holoprosencephaly. |
| Source: | N Engl J Med 2003 Apr 10, 348 (15),1449-1454 |

300 copies of this article amount to:                    **CHF 1'087.00 ± USD 946.00**

| | |
|---|---|
| **Payment terms:** | All invoices have to be paid within 30 days after invoice date. All prices are VAT excluded. In case of overdue payment, VMP is entitled to overcharge an interest rate of 1,5% per month. Any expense to collect overdue payments is on account of Newjen Corp. |
| **Delivery terms:** | 5 working days after receipt of the order and article availability. Franco warehouse VIA Marketing & Promotion SA. |
| **Offer validity:** | 1 month after the date of this offer. |
| **Applicable Law:** | This agreement is governed by Swiss law. Any legal dispute will be settled at the court in Lugano. The Language of the court is the English language. + |

If you accept our offer, please send an email with your approval with also your PO number and delivery address. We require a signed copy of the offer by fax (+ 41 91 - 9931534).

---



**Multiple Copies, Copyrights and Distribution:**

Newjen Corp.accepts by ordering multiple copies of a document the "Conditions for Document Delivery" of VIA Marketing & Promotion SA, Via Chiosso 15, 6948 Porza, Switzerland (VMP), and in consequence  is allowed to distribute free of charge, to its employees and/or selected customers one copy only of the  document, under the condition that all terms of VMP's "Conditions for Document Delivery" remain respected.

For each copy of a document ordered by- and supplied to the client VMP pays the copyright fee due.

All copyright fees are passed to the authorized Swiss Copyright Society for Literature and Art for worldwide distribution to publishers and other rights holders.

VIA Marketing & Promotion indemnifies Newjen Corp.in this respect. In case the relevant authorities increase the copyrights, VIA Marketing & Promotion is entitled to invoice these extra costs to Newjen Corp. The ActaMed® logo is printed on each page.

**Conditions for Document Delivery:**
1.  All article copies are for private study only;
2.  Per person only one copy of each article may be delivered and may not be copied, sold or transferred to any other third party;
3.  Payment of a copyright fee does not give you permission to make further copies from items supplied by VIA Marketing & Promotion SA.

Yours sincerely,

**VIA Marketing & Promotion SA**                    **NEWJEN CORP.**

_____            _____

Boudewijn F. Gruwel
*Commercial Director*

---

**VIA Marketing & Promotion SA**
Via Chiosso 15 • 6948 Porza • Switzerland • Tel. +41 91 993.11.77 • Fax +41 91 993.15.34
E-mail: marketing@actamed.ch • www.actamed.ch • www.actamed-services.com • VAT 188522