# UNITED STATES DISTRICT COURT
## for the
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| BLACKWELL PUBLISHING, INC., )<br>ELSEVIER, INC., )<br>MASSACHUSETTS MEDICAL SOCIETY,)<br>and )<br>WILEY-LISS, INC., )<br> )<br> Plaintiffs, )<br> )<br> v. )<br> )<br>VIA MARKETING & PROMOTION, S.A. )<br>d/b/a ACTAMED SERVICES and )<br>ROBERT TH. GMELIG MEYLING, )<br> )<br> Defendants. ) | Civil Action No.: 05cv10697 WGY |

## AFFIDAVIT OF HOLGER GEHRING

Before me, the undersigned notary public of Geneva, Switzerland has today appeared

**Holger Gehring**, attorney at law, German national, born in Stuttgart, resident in Geneva, Switzerland, personally known to me

and declared after being referred to article 253 (two hundred and fifty-three) of the Swiss penal code:

I, Holger Gehring, German national, born in Stuttgart, Germany, hereby declare as

  follows:

1.   I am a German attorney at CSL Law Firm, located at Rue du Marché 12-14,

CH-1204, Geneva, Switzerland.

2.      I represent plaintiffs Elsevier, B.V., Blackwell Publishing, Ltd., Springer Verlag GmbH, BMJ Publishing Group Ltd., Adis International Ltd. and Birkhauser Verlag AG, among others, in a civil action against plaintiff and counter defendant VIA Marketing & Promotion, S.A. d/b/a ActaMed ("ActaMed") that is pending before the Court of Appeal of the Canton of Ticino, Switzerland.  The suit is based on copyright infringement in violation of Swiss law and involves activities of Actamed similar to those at issue in the United States action.

3.  The Public Prosecutor in Lugano, Switzerland initiated a criminal investigation.  We have received numerous documents from that investigation regarding the activities of ActaMed and Robert Th. Gmelig Meyling ("Meyling").

4.  I have examined the Swiss commercial register and can confirm that Meyling is listed as the President and General Director of VIA Marketing and Promotion, S.A. from July 3, 1997 to October 14, 2005.

5. Attached hereto as <u>Exhibit A I</u> is a true and accurate copy of a part of the current Swiss Code of Obligations, Articles 714 - 725 and 754-759, in German. Attached hereto as <u>Exhibit A II</u> is an English translation of the official text of the above articles of the current Swiss code of Obligation, Volume II, Company Law, Articles 552-964, produced by the Swiss-American Chamber of Commerce in 1992.

2

6. Attached hereto as <u>Exhibit B</u> is a true and accurate copy of a letter from ProLitteris to the Swiss prosecutor dated September 14, 2005, as well as an English translation of this letter. The letter included an Annex of documents, including a letter from ProLitteris to Meyling dated June 23, 2000 and an e-mail from Meyling to ProLitteris dated August 24, 2000. A true and accurate copy of these two documents as they have been submitted as Annex to the letter from ProLitteris to the Swiss prosecutor dated September 14, 2005 is attached hereto, namely as <u>Exhibit C</u> the letter from ProLitteris to Meyling dated June 23, 2000, as well as an English translation of that letter, and as <u>Exhibit D</u> the e-mail from Meyling to ProLitteris dated August 24, 2000, as well as an English translation of that e-mail.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY UNDER THE LAWS OF SWITZERLAND

DECLARED AND SIGNED BEFORE ME CHANTAL BINDER, A NOTARY PUBLIC IN GENEVA, SWITZERLAND this 9th (ninth) Day of February 2006 (two thousand six).



Holger Gehring, Esq.



ETUDE DE
Me Chantal BINDER-RAETZ
Notaire
8, place des Eaux-Vives
CASE POSTALE 6015 - 1211 GENEVE 6
℡ 022 718 34 70  fax 022 718 34 79

3

## 290 Schweiz. Obligationenrecht

**II. Organisation. 1. Präsident und Sekretär.**

**712** [714¹] ¹ Der Verwaltungsrat bezeichnet seinen Präsidenten und den Sekretär [713]. Dieser muss dem Verwaltungsrat nicht angehören.

² Die Statuten können bestimmen, dass der Präsident durch die Generalversammlung gewählt wird.

**Beschlüsse.**

**713** [716, 715¹] ¹ Die Beschlüsse des Verwaltungsrates werden mit der Mehrheit der abgegebenen Stimmen gefasst. Der Vorsitzende hat den Stichentscheid, sofern die Statuten nichts anderes vorsehen.

² Beschlüsse können auch auf dem Wege der schriftlichen Zustimmung zu einem gestellten Antrag gefasst werden, sofern nicht ein Mitglied die mündliche Beratung verlangt.

³ Über die Verhandlungen und Beschlüsse ist ein Protokoll zu führen, das vom Vorsitzenden und vom Sekretär [712¹] unterzeichnet wird.

**3. Nichtige Beschlüsse.**

**714** [715¹] Für die Beschlüsse des Verwaltungsrates gelten sinngemäss die gleichen Nichtigkeitsgründe wie für die Beschlüsse der Generalversammlung [706b].

**4. Recht auf Einberufung.**

**715** [713³] ¹ Jedes Mitglied des Verwaltungsrates kann unter Angabe der Gründe vom Präsidenten [712] die unverzügliche Einberufung einer Sitzung verlangen.

**5. Recht auf Auskunft und Einsicht.**

**715a** [713³] ¹ Jedes Mitglied des Verwaltungsrates kann Auskunft über alle Angelegenheiten der Gesellschaft verlangen.

² In den Sitzungen sind alle Mitglieder des Verwaltungsrates sowie die mit der Geschäftsführung betrauten Personen [716b, 721] zur Auskunft verpflichtet.

³ Ausserhalb der Sitzungen kann jedes Mitglied von den mit der Geschäftsführung betrauten Personen [715a²] Auskunft über den Geschäftsgang und, mit Ermächtigung des Präsidenten [712], auch über einzelne Geschäfte verlangen.

⁴ Soweit es für die Erfüllung einer Aufgabe erforderlich ist, kann jedes Mitglied dem Präsidenten beantragen, dass ihm Bücher und Akten vorgelegt werden.

⁵ Weist der Präsident ein Gesuch auf Auskunft, Anhörung oder Einsicht ab, so entscheidet der Verwaltungsrat.

⁶ Regelungen oder Beschlüsse des Verwaltungsrates, die das Recht auf Auskunft und Einsichtnahme der Verwaltungsräte erweitern, bleiben vorbehalten.

**III. Aufgaben. I. Im allgemeinen.**

**716** [721¹] ¹ Der Verwaltungsrat kann in allen Angelegenheiten Beschluss fassen, die nicht nach Gesetz oder Statuten der Generalversammlung [698/706b] zugeteilt sind [s. aber 725a].

## Die Aktiengesellschaft 291

² Der Verwaltungsrat führt die Geschäfte der Gesellschaft, soweit er die Geschäftsführung nicht übertragen hat [716b].

**2. Unübertragbare Aufgaben.**

**716a** [722.3, 714²] ¹ Der Verwaltungsrat hat folgende unübertragbare und unentziehbare Aufgaben:

1. die Oberleitung der Gesellschaft und die Erteilung der nötigen Weisungen;
2. die Festlegung der Organisation [z. B. 716b²];
3. die Ausgestaltung des Rechnungswesens, der Finanzkontrolle sowie der Finanzplanung, sofern diese für die Führung der Gesellschaft notwendig ist;
4. die Ernennung und Abberufung der mit der Geschäftsführung und der Vertretung betrauten Personen [716b, 718²];
5. die Oberaufsicht über die mit der Geschäftsführung betrauten Personen [716b], namentlich im Hinblick auf die Befolgung der Gesetze, Statuten, Reglemente [716b, 718¹] und Weisungen [716a Ziff. 1];
6. die Erstellung des Geschäftsberichtes*) [662] sowie die Vorbereitung der Generalversammlung [698/706b] und die Ausführung ihrer Beschlüsse;
7. die Benachrichtigung des Richters im Falle der Überschuldung [725²].

² Der Verwaltungsrat kann die Vorbereitung und die Ausführung seiner Beschlüsse oder die Überwachung von Geschäften Ausschüssen oder einzelnen Mitgliedern zuweisen. Er hat für eine angemessene Berichterstattung an seine Mitglieder zu sorgen.

*) Berichtigt von der Redaktionskommission der Bundesversammlung (AS 1992 S. 771).

**3. Übertragung der Geschäftsführung.**

**716b** [717] ¹ Die Statuten können den Verwaltungsrat ermächtigen [627 Ziff. 12], die Geschäftsführung nach Massgabe eines Organisationsreglementes [716b²] ganz oder zum Teil an einzelne Mitglieder oder an Dritte zu übertragen.

² Dieses Reglement ordnet die Geschäftsführung, bestimmt die hierfür erforderlichen Stellen, umschreibt deren Aufgaben und regelt insbesondere die Berichterstattung. Der Verwaltungsrat orientiert Aktionäre und Gesellschaftsgläubiger, die ein schutzwürdiges Interesse glaubhaft machen, auf Anfrage hin schriftlich über die Organisation der Geschäftsführung.

³ Soweit die Geschäftsführung nicht übertragen worden ist [716b¹], steht sie allen Mitgliedern des Verwaltungsrates gesamthaft zu.

## 292    Schweiz. Obligationenrecht

**IV. Sorgfalts- und Treue-pflicht.**

**717 [722¹].** ¹ Die Mitglieder des Verwaltungsrates sowie Dritte, die mit der Geschäftsführung betrasst sind [716b], müssen ihre Aufgaben mit aller Sorgfalt [99] erfüllen und die Interessen der Gesellschaft in guten Treuen wahren.
² Sie haben die Aktionäre unter gleichen Voraussetzungen gleich zu behandeln [vgl. 706² Ziff. 3].

**V. Vertretung. 1. Im allgemeinen.**

**718 [717].** ¹ Der Verwaltungsrat vertritt die Gesellschaft nach aussen [ZGB 55¹: s. aber 706a²]. Bestimmen die Statuten oder das Organisationsreglement [716b¹] nichts anderes, so steht die Vertretungsbefugnis jedem Mitglied einzeln zu [708²].
² Der Verwaltungsrat kann die Vertretung einem oder mehreren Mitgliedern (Delegierte) oder Dritten (Direktoren) übertragen.
³ Mindestens ein Mitglied des Verwaltungsrates muss zur Vertretung befugt sein.

**2. Umfang und Beschränkung.**

**718a [718¹·².]** ¹ Die zur Vertretung befugten Personen [718] können im Namen der Gesellschaft alle Rechtshandlungen vornehmen, die der Zweck der Gesellschaft mit sich bringen kann [933] mit sich bringen kann.
² Eine Beschränkung dieser Vertretungsbefugnis hat gegenüber gutgläubigen Dritten [ZGB 3] keine Wirkung; ausgenommen sind die im Handelsregister eingetragenen Bestimmungen [933¹] über die ausschliessliche Vertretung der Hauptniederlassung oder einer Zweigniederlassung [642; HRegV 71 lit. l] oder über die gemeinsame Vertretung der Gesellschaft [641 Ziff. 8].

**3. Zeichnung.**

**719 [719].** Die zur Vertretung der Gesellschaft befugten Personen [718] haben in der Weise zu zeichnen, dass sie der Firma der Gesellschaft [626 Ziff. 1] ihre Unterschrift beifügen.

**Eintragung.**

**720 [720].** Die zur Vertretung der Gesellschaft befugten Personen [718] sind vom Verwaltungsrat zur Eintragung in das Handelsregister [641 Ziff. 9; HRegV 71 lit. f] anzumelden, unter Vorlegung einer beglaubigten Abschrift des Beschlusses [715fc]. Sie haben ihre Unterschrift beim Handelsregisteramt zu zeichnen oder die Zeichnung in beglaubigter Form einzureichen.

**Prokuristen und Bevoll-mächtigte.**

**721 [721²].** Der Verwaltungsrat kann Prokuristen [458] und andere Bevollmächtigte ernennen.

**VI. Organ-haftung.**

**722 [718³].** Die Gesellschaft haftet für den Schaden aus unerlaubten Handlungen [ZGB 55² OR 41 ff., 97 ff.] die eine zur Geschäftsführung oder zur Vertretung befugte Person in Ausübung ihrer geschäftlichen Verrichtungen begeht [814³, 899¹].

## 293    Die Aktiengesellschaft

**723 und 724.** (Aufgehoben gemäss BG vom 4. Oktober 1991 über die Änderung des Obligationenrechts [Die Aktiengesellschaft, AS 1992 S. 733].)

**VII. Kapitalverlust und Überschuldung. 1. Anzeigepflichten.**

**725 [725¹·²·³].** ¹ Zeigt die letzte Jahresbilanz, dass die Hälfte des Aktienkapitals [620¹, 626 Ziff. 3, 641 Ziff. 4, 656b³] und der gesetzlichen Reserven [671/671b] nicht mehr gedeckt ist [670], so beruft der Verwaltungsrat unverzüglich eine Generalversammlung ein [699, 700] und beantragt ihr Sanierungsmassnahmen.
² Wenn begründete Besorgnis einer Überschuldung besteht, muss eine Zwischenbilanz erstellt und diese der Revisionsstelle zur Prüfung [727, 728] vorgelegt werden. Ergibt sich aus der Zwischenbilanz, dass die Forderungen der Gesellschaftsgläubiger weder zu Fortführungs- noch zu Veräusserungswerten gedeckt sind, so hat der Verwaltungsrat [716a Ziff. 7, 729b²] den Richter zu benachrichtigen [725a], sofern nicht Gesellschaftsgläubiger in Ausmass dieser Unterdeckung im Rang hinter alle anderen Gesellschaftsgläubiger zurücktreten.

¹) Beachte aber Art. 35 Abs. 2 BankG.

**2. Eröffnung oder Aufschub des Konkurses.**

**725a [725³·⁴].** ¹ Der Richter eröffnet auf die Benachrichtigung [725¹] hin den Konkurs. Er kann ihn auf Antrag des Verwaltungsrates oder eines Gläubigers aufschieben], falls Aussicht auf Sanierung besteht; in diesem Falle trifft er Massnahmen zur Erhaltung des Vermögens.
² Der Richter kann einen Sachwalter bestellen und entweder dem Verwaltungsrat die Verfügungsbefugnis entziehen oder dessen Beschlüsse von der Zustimmung des Sachwalters abhängig machen. Er umschreibt die Aufgaben des Sachwalters.
³ Der Konkursaufschub muss nur veröffentlicht werden, wenn dies zum Schutze Dritter erforderlich ist.

**VIII. Abberufung und Einstellung.**

**726 [726].** ¹ Der Verwaltungsrat kann die von ihm bestellten Ausschüsse [716²], Delegierten, Direktoren [718³] und andern Bevollmächtigten [716²] und Beauftragten [721] jederzeit abberufen.
² Die von der Generalversammlung bestellten Bevollmächtigten und Beauftragten [705] können vom Verwaltungsrat jederzeit in ihren Funktionen eingestellt werden, unter sofortiger Einberufung einer Generalversammlung [699², 705].
³ Entschädigungsansprüche der Abberufenen oder in ihren Funktionen Eingestellten bleiben vorbehalten [404², 705²].

## 304

Schweiz. Obligationenrecht

### Sechster Abschnitt

### Verantwortlichkeit

**A. Haftung.**
**I. Für den Emissionsprospekt.**

**752 [752]:** Sind bei der Gründung einer Gesellschaft [629] oder bei der Ausgabe von Aktien [650 ff., 656a] Obligationen [1156] oder ähnlichen Mitteilungen unrichtige, irreführende oder den gesetzlichen Anforderungen nicht entsprechende Angaben gemacht oder verbreitet worden, so haftet jeder, der absichtlich oder fahrlässig dabei mitgewirkt hat, den Erwerbern der Titel für den dadurch verursachten Schaden.
Siehe auch BankG 39.

**II. Gründungshaftung.**

**753 [753]:** Gründer [629], Mitglieder des Verwaltungsrates [707] und alle Personen, die bei der Gründung [629, 650 ff.] mitwirken, werden sowohl der Gesellschaft wie den einzelnen Aktionären und Gesellschaftsgläubigern für den Schaden verantwortlich, wenn sie

1. absichtlich oder fahrlässig Sacheinlagen [628], 634], Sachübernahmen [628?] oder die Gewährung besonderer Vorteile [628?] zugunsten von Aktionären oder anderen Personen in den Statuten [628, 650/1, 635b], einem Gründungsbericht [635] oder einem Kapitalerhöhungsbericht [652e] unrichtig oder irreführend angeben, verschweigen oder verschleiern, oder bei der Genehmigung einer solchen Massnahme in anderer Weise dem Gesetz zuwiderhandeln;

2. absichtlich oder fahrlässig die Eintragung der Gesellschaft in das Handelsregister aufgrund einer Bescheinigung oder Urkunde veranlassen, die unrichtige Angaben enthält;

3. wissentlich dazu beitragen, dass Zeichnungen zahlungsunfähiger Personen angenommen werden.
Siehe auch BankG 40.

**III. Haftung für Verwaltung, Geschäftsführung und Liquidation.**

**754 [754]:** 1 Die Mitglieder des Verwaltungsrates [707] und alle mit der Geschäftsführung [716b] oder mit der Liquidation [739/47] befassten Personen sind sowohl der Gesellschaft [993] gegenüber für den Schaden verantwortlich, den sie durch absichtliche oder fahrlässige Verletzung ihrer Pflichten verursachen [762].

2 Wer die Erfüllung einer Aufgabe befugterweise einem anderen Organ überträgt [z. B. 716b], haftet für den von diesem verursachten Schaden, sofern er nicht nachweist, dass er bei der

## 305

Die Aktiengesellschaft

Auswahl, Unterrichtung und Überwachung die nach den Umständen gebotene Sorgfalt angewendet hat [399?].
Siehe auch BankG 41/2.

**IV. Revisionshaftung.**

**755 [7541]** Alle mit der Prüfung der Jahres- und Konzernrechnung [728, 731a], der Gründung [635a], der Kapitalerhöhung [652, 653f] oder Kapitalherabsetzung [732?] befassten Personen sind sowohl der Gesellschaft [756?] als auch den einzelnen Aktionären und Gesellschaftsgläubigern für den Schaden verantwortlich, den sie durch absichtliche oder fahrlässige Verletzung ihrer Pflichten verursachen [762?].

**B. Schaden der Gesellschaft.**
**I. Ansprüche ausser Konkurs.**

**756 [755]** 1 Neben der Gesellschaft [993 Ziff. 4] sind auch die einzelnen Aktionäre berechtigt, den der Gesellschaft verursachten Schaden einzuklagen. Der Anspruch des Aktionärs geht auf Leistung an die Gesellschaft [vgl. 6783].

2 Hatte der Aktionär aufgrund der Sach- und Rechtslage begründeten Anlass zur Klage [ZGB 3]-7], so verteilt der Richter die Kosten, soweit sie nicht vom Beklagten zu tragen sind, nach seinem Ermessen [ZGB 4] auf den Kläger und die Gesellschaft.
Siehe auch BankG 43.

**II. Ansprüche im Konkurs.**

**757 [756, 758]** 1 Im Konkurs der geschädigten Gesellschaft [993 Ziff. 4] sind auch die Gesellschaftsgläubiger berechtigt, Ersatz des Schadens an die Gesellschaft zu verlangen. Zunächst steht es jedoch der Konkursverwaltung zu, die Ansprüche von Aktionären und Gesellschaftsgläubigern geltend zu machen.

2 Verzichtet die Konkursverwaltung auf die Geltendmachung dieser Ansprüche, so ist hierzu jeder Aktionär oder Gläubiger berechtigt. Das Ergebnis wird vorab zur Deckung der Forderungen der klagenden Gläubiger gemäss den Bestimmungen des Bundesgesetzes über Schuldbetreibung und Konkurs[1] verwendet. Am Überschuss nehmen die klagenden Aktionäre im Ausmass ihrer Beteiligung an der Gesellschaft teil; der Rest fällt in die Konkursmasse.

3 Vorbehalten bleibt die Abtretung von Ansprüchen der Gesellschaft gemäss Artikel 260 des Bundesgesetzes über Schuldbetreibung und Konkurs[1].
Siehe auch BankG 43.

---

1) SR 281.1.

306     Schweiz. Obligationenrecht

**III. Wirkung des Entlastungsbeschlusses.**

**758** [757]. 1 Der Entlastungsbeschluss [695, 698² Ziff. 5] der Generalversammlung wirkt nur für bekanntgegebene Tatsachen und nur gegenüber der Gesellschaft sowie gegenüber den Aktionären, die dem Beschluss zugestimmt oder die Aktien seither in Kenntnis des Beschlusses erworben haben.

2 Das Klagerecht der übrigen Aktionäre erlischt sechs Monate [771 Ziff. 3] nach dem Entlastungsbeschluss.

Siehe auch BankG 43.

**C. Solidarität und Rückgriff.**

**759** [759]. 1 Sind für einen Schaden mehrere Personen ersatzpflichtig, so ist jede von ihnen insoweit mit den anderen solidarisch haftbar [143 ff.], als ihr der Schaden aufgrund ihres eigenen Verschuldens und der Umstände [43¹] persönlich zurechenbar ist.

2 Der Kläger kann mehrere Beteiligte gemeinsam für den Gesamtschaden einklagen und verlangen, dass der Richter im gleichen Verfahren die Ersatzpflicht jedes einzelnen Beklagten festsetze.

3 Der Rückgriff unter mehreren Beteiligten [148/9] wird vom Richter [50²] in Würdigung aller Umstände [ZGB 4] bestimmt.

Siehe auch BankG 44.

**D. Verjährung.**

**760** [760]. 1 Der Anspruch auf Schadenersatz gegen die nach den vorstehenden Bestimmungen verantwortlichen Personen verjährt in fünf Jahren von dem Tage an, an dem der Geschädigte Kenntnis vom Schaden und von der Person der Ersatzpflichtigen erlangt hat, jedenfalls aber mit dem Ablaufe von zehn Jahren, vom Tage der schädigenden Handlung an gerechnet [60¹].

2 Wird die Klage aus einer strafbaren Handlung hergeleitet, für die das Strafrecht eine längere Verjährung vorschreibt, so gilt diese auch für den Zivilanspruch [60²].

Siehe auch BankG 45.

**E. Gerichtsstand.**

**761** [761]. Die Klage kann gegen alle verantwortlichen Personen beim Richter am Sitz der Gesellschaft [641 Ziff. 2] angebracht werden.

Die Aktiengesellschaft     307

**Siebenter Abschnitt**

**Beteiligung von Körperschaften des öffentlichen Rechts**

**762** [762]. 1 Haben Körperschaften des öffentlichen Rechts wie Bund, Kanton, Bezirk oder Gemeinde ein öffentliches Interesse an einer Aktiengesellschaft, so kann der Körperschaft in den Statuten der Gesellschaft das Recht eingeräumt werden, Vertreter in den Verwaltungsrat [707] oder in die Revisionsstelle [727] abzuordnen, auch wenn sie nicht Aktionärin ist.

2 Bei solchen Gesellschaften sowie bei gemischtwirtschaftlichen Unternehmungen, an denen eine Körperschaft des öffentlichen Rechts als Aktionär beteiligt ist, steht das Recht zur Abberufung [705] der von ihr abgeordneten Mitglieder des Verwaltungsrates und der Revisionsstelle nur ihr selbst zu.

3 Die von einer Körperschaft des öffentlichen Rechts abgeordneten Mitglieder des Verwaltungsrates und der Revisionsstelle haben die gleichen Rechte und Pflichten wie die von der Generalversammlung gewählten.

4 Für die von einer Körperschaft des öffentlichen Rechts abgeordneten Mitglieder haftet die Körperschaft der Gesellschaft, den Aktionären und den Gläubigern gegenüber, unter Vorbehalt des Rückgriffs nach dem Recht des Bundes und der Kantone.

**Achter Abschnitt**

**Ausschluss der Anwendung des Gesetzes auf öffentlich-rechtliche Anstalten**

**763** [763]. 1 Auf Gesellschaften und Anstalten, wie Banken, Versicherungs- oder Elektrizitätsunternehmen, die durch besondere kantonale Gesetze gegründet werden sind und unter Mitwirkung öffentlicher Behörden verwaltet werden, kommen, sofern der Kanton die subsidiäre Haftung für deren Verbindlichkeiten übernimmt, die Bestimmungen über die Aktiengesellschaft auch dann nicht zur Anwendung, wenn das Kapital ganz oder teilweise in Aktien zerlegt ist und unter Beteiligung von Privatpersonen aufgebracht wird.

²The board of directors shall manage the business of the Company insofar as it has not delegated it to the management.

**Art. 716a**

2. Nontransferable and
able duties

¹The board of directors has the following nontransferable and inalienable duties:

1. the ultimate management of the Company and the giving of the necessary directives;

2. the establishment of the organization;

3. the structuring of the accounting system and of the financial controls as well as the financial planning insofar as this is necessary to manage the Company;

4. the appointment and removal of the persons entrusted with the management and the representation;

5. the ultimate supervision of the persons entrusted with the management, in particular, in view of compliance with the law, the articles of incorporation, regulations, and directives;

6. the preparation of the business report as well as the preparation of the general meeting of shareholders, and the implementing of its resolutions;

7. the notification of the judge in the case of overindebtedness.

²The board of directors may assign the preparation and the implementation of its resolutions or the supervision of business transactions to committees or individual members. It shall provide for adequate reporting to its members.

**Art. 716b**

3. Delegation of
the manage-
ment

¹The articles of incorporation may authorize the board of directors to fully or partially delegate the management to individual members or third parties in accordance with an organizational regulation.

²This regulation organizes the management, determines the positions required therefor, defines their duties, and regulates, in particular, the reporting. Upon request, the board of directors in-

---

unless otherwise provided for by the articles of incorporation.

²Resolutions may also be adopted by way of written consent to a proposition, unless a member requests discussion.

³Deliberations and resolutions shall be minuted and signed by the meeting chairman and the secretary.

**Art. 714**

3. Nullity of
resolutions

The same grounds for nullity of resolutions of the general meeting of shareholders shall apply by analogy to resolutions of the board of directors.

**Art. 715**

4. Right of
convocation

Any member of the board of directors may, stating the reasons, request the chairman to immediately call a meeting.

**Art. 715a**

5. Right to
information
and of
inspection

¹Any member of the board of directors may request information about all matters concerning the Company.

²At the meetings, all members of the board of directors, as well as the persons entrusted with the management, shall be obligated to provide information.

³Apart from the meetings, any member may request from the persons entrusted with the management information concerning the course of the business and, with the authorization of the chairman, also information concerning specific matters.

⁴To the extent necessary for the fulfillment of a duty, any member may apply to the chairman to be shown the books and the files.

⁵If the chairman declines a request for information, a hearing, or an inspection, the board of directors shall decide.

⁶Rules and resolutions of the board of directors expanding the right of members of the board of directors to information and of inspection remain reserved.

**Art. 716**

III. Duties
1. in general

¹The board of directors may take decisions on all matters which by law or the articles of incorporation are not allocated to the general meeting of shareholders.

*IV. Duty of care and loyalty*

forms those shareholders and Company obligees who make a credible showing of an interest worthy of being protected in writing about the organization of the management.

³ To the extent the management has not been delegated, it shall be vested jointly in the members of the board of directors.

**Art. 717**

¹ The members of the board of directors as well as third parties engaged with the management shall carry out their duties with due care and must duly safeguard the interests of the Company.

² Circumstances being equal, they shall give equal treatment to shareholders.

**Art. 718**

*V. Representation 1. In general*

¹ The board of directors represents the Company towards third parties. Unless the articles of incorporation or the organizational regulation provide otherwise, each member has the power to represent the Company individually.

² The board of directors may delegate the power of representation to one or several members (managing directors) or third parties (managers).

³ At least one member of the board of directors must be empowered to represent the Company.

**Art. 718a**

*2. Scope and limitation*

¹ Persons empowered to represent the Company may, in the name of the Company, perform all legal acts that may arise within the Company's purpose.

² A restriction of this power to represent is of no effect as regards third parties in good faith; exempt herefrom are the provisions entered into the Commercial Register concerning the exclusive representation of the principal establishment, or a branch, or concerning the collective representation of the Company.

**Art. 719**

*3. Signature*

The persons empowered to represent the Company shall sign by adding their signatures to the name of the Company.

**Art. 720**

*4. Entry*

The board of directors shall apply for entry in the Commercial Register of the persons empowered to represent the Company by submitting a notarized copy of the resolution. These persons shall sign before the Commercial Registrar or submit a notarized signature.

**Art. 721**

*5. Holders of procuration and commercial mandate holders*

The board of directors may appoint holders of procuration and other commercial mandate holders.

**Art. 722**

*VI. Company liability for its corporate bodies*

The Company is liable for any damage resulting from tort committed by a person empowered to manage or to represent the Company in the course of its business activities.

**Arts. 723 - 724**

*repealed*

**Art. 725**

*VII. Loss of capital and overindebtedness 1. Duty to notify*

¹ If the last annual balance sheet shows that half of the share capital and the legal reserves are no longer covered, the board of directors shall without delay call a general meeting of shareholders and propose a financial reorganization.

² In case of a substantiated concern of overindebtedness, an interim balance sheet must be prepared and submitted to the auditors for examination. If the interim balance sheet shows that the claims of the Company's obligees are neither covered if the assets are appraised at on-going business values nor at liquidation values, then the board of directors shall notify the judge unless obligees of the Company subordinate their claims to those of all other Company obligees to the extent of such insufficient coverage.

**Art. 725a**

*2. Adjudication or postponement of bankruptcy*

¹ Upon being notified, the judge adjudicates the bankruptcy. At the request of the board of directors or an obligee, he may post-

2. intentionally or negligently cause the entry of the Company in the Commercial Register on the basis of a confirmation or a deed containing incorrect statements;

3. knowingly contribute to the acceptance of subscriptions from insolvent persons.

**III. Liability for administration, management and liquidation**

### Art. 754

[1]The members of the board of directors and all persons engaged in the management or liquidation are liable not only to the Company, but also to each shareholder and to the Company's obligees for the damage caused by an intentional or negligent violation of their duties.

[2]Whoever rightfully delegates the fulfillment of a duty to another corporate body is liable for any damage caused by it unless he proves that he applied the necessary care in selection, instruction and supervision under the circumstances.

**IV. Audit liability**

### Art. 755

All persons engaged in the audit of the annual accounts and the consolidated financial statements, the foundation, a capital increase, or a capital reduction are liable not only to the Company but also to each shareholder and the Company's obligees for the damage caused by an intentional or negligent violation of their duties.

**B. Damage to the Company I. Claims outside bankruptcy**

### Art. 756

[1]In addition to the Company, each shareholder is entitled to file an action for damage caused to the Company. The claim of the shareholder is for performance to the Company.

[2]If the shareholder, based upon the factual and legal situation, had sufficient cause to file an action, the judge shall divide the costs in his discretion between the plaintiff and the Company to the extent they are not imposed upon the defendant.

**II. Claims in bankruptcy**

### Art. 757

[1]In the case of bankruptcy of the damaged Company, also the obligees of the Company are entitled to request that the damage to the Company be compensated. In the first instance, however, the trustee in bankruptcy may assert the claims of shareholders and obligees of the Company.

[2]If the trustee in bankruptcy waives the right to assert these claims, any shareholder or obligee shall be entitled to do so. The proceeds shall be used in the first instance to cover the claims of the obligees filing suit in accordance with the provisions of the Federal Act on Debt Enforcement and Bankruptcy. The shareholders filing suit shall participate in the surplus in proportion to their participation in the Company; the remainder falls into the bankruptcy estate.

[3]The assignment of Company claims according to Article 260 of the Federal Act on Debt Enforcement and Bankruptcy remains reserved.

**III. Effect of the resolution of release**

### Art. 758

[1]The resolution of release passed by the general meeting of shareholders is effective only for facts that have been disclosed and only vis-à-vis the Company and those shareholders who consented to the resolution, or who acquired shares subsequently with knowledge of the resolution.

[2]The right of the other shareholders to file an action is extinguished six months after the resolution of release.

**C. Joint and several liability and recourse**

### Art. 759

[1]If several persons are liable for a damage, any one of them is liable jointly and severally with the others to the extent the damage is attributable to such person based on his own fault and the circumstances.

[2]The plaintiff may sue several participants jointly for the total damage and request that the judge set the liability of each individual defendant in the same proceeding.

[3]The recourse to several participants shall be determined by the judge considering all circumstances.

**D. Statute of limitations**

### Art. 760

[1]The claim to compensation for damages against any persons responsible according to the above provisions is barred after five

**20**

STUDIO LEGALE E NOTARILE

# PEDRAZZINI

Avv. Dr. FRANCO PEDRAZZINI, LL.M. e notaio
Iscritto nel Registro cantonale degli Avvocati

**Raccomandata**
Lodevole
Ministero pubblico
Via Pretorio 16
6900 Lugano



MINISTERO PUBBLICO
DEL CANTONE TICINO
1·5 SET. 2005
LUGANO

Locarno, 14 settembre 2005

Inc. no. 2004.9689/AL/AL √
**Querela 6.12.2004 – Acta Med – Via Marketing & Promotion SA, Porza**

Onorevole Signora Procuratore pubblico

Le notifico che il sottoscritto legale rappresenta, assieme alla Collega dr.ssa Magda Streuli Youssef dello studio legale Walder Wyss & Partner di Zurigo, la cooperativa ProLitteris, nella pratica a margine.

Come sa, è stato possibile ricevere, d'intesa con Lei, i documenti che l'Avv. Giovanna Bonafede Le ha inviato per conto della Via Marketing & Promotions SA (nel prosieguo del testo indicata con "VMP") in data 13 maggio 2005.

Orbene, i documenti inviati dall'Avv. Giovanna Bonafede appaiono all'evidenza *incompleti* e pertanto presentano un quadro unilaterale, errato e distorto della situazione. La mia cliente è inoltre a conoscenza del fatto che la VMP afferma che ProLitteris avrebbe autorizzato tutta la sua attività, concedendole non meglio specificati nullaosta.

Questa affermazione non è affatto esatta e può recare a ProLitteris, ma anche ai titolari dei diritti, notevoli pregiudizi.

Per questo motivo ProLitteris si vede ampiamente legittimata a presentare le dovute rettifiche e i dovuti chiarimenti con la presente memoria.

c.c.p. 65-41176-6
via Ciseri 2·B, Palazzo UBS, C.P. 343, CH-6001 LOCARNO 1
Tel: +41 91 751 88 35, Fax: +41 91 751 44 50, avv.pedrazzini@ticino.com

I.    **In merito all'attività di ProLitteris**

1.    ProLitteris, Società svizzera per i diritti degli autori d'arte letteraria e visuale, è una
      società cooperativa ai sensi degli art. 828 e segg. CO. Essa ha sede a Zurigo. Tra le
      sue funzioni figura la tutela dei diritti degli autori, delle case editrici e di altri titolari di
      diritti di opere letterarie e drammatiche.

      Prolitteris è autorizzata e tenuta, sulla base dell'autorizzazione concessale dall'Ufficio
      federale della Proprietà Intellettuale del 23 maggio 2003, a far valere i diritti che
      scaturiscono dagli artt. 13, 20 e 22 della Legge federale sul diritto d'autore e sui diritti di
      protezione affini (in seguito: LDA).

      Prove:

      doc. 1.  Statuto della ProLitteris, edizione del 7 settembre 2002

      doc. 2.  Atto dell'Ufficio federale della Proprietà Intellettuale (IPI)
               del 2 giugno 2003, pubblicato sulla Gazzetta commerciale
               svizzera del 2.6.2003, n. 103

2.    I diritti all'indennità fatti valere da ProLitteris si basano su tariffe approvate dalla
      Commissione arbitrale federale per la gestione dei diritti d'autore e dei diritti affini (CAF)
      (cfr. art. 46 LDA), vincolanti per i tribunali (art. 59 cpv. 3 LDA).

3.    Poiché la VMP, in base alle informazioni da lei stessa fornite, produce per conto dei
      suoi clienti riproduzioni di articoli di giornale, trova applicazione in linea di principio la
      Tariffa Comune 8 (nel prosieguo del testo indicata con "TC 8"), tariffa parziale VI
      (reprografia nel settore dei servizi). In questa sede viene prodotta la tariffa TC 8/VI
      valida per il periodo 1 gennaio 2002 -31 dicembre 2006. Si rimanda in particolare ai
      punti 6.3.24.1 e segg. della tariffa.

      Prove:

      doc. 3.  Tariffa TC 8/VI (Reprografia nel settore dei servizi)

II.   **Il sistema del diritto legale all'utilizzazione dell'opera per uso privato**

4.    Ogni utente deve verificare nel proprio caso specifico, se l'utilizzo da lui previsto ricade
      nell'ambito del diritto all'utilizzazione dell'opera per uso privato ai sensi dell'art. 19 LDA
      o del diritto esclusivo dell'autore, ai sensi dell'art. 10 LDA. Non è compito di ProLitteris,
      rilasciare autorizzazioni di sorta a coloro che utilizzano opere.

5.    La LDA concede all'autore una serie di diritti esclusivi. Di norma, senza l'autorizzazione
      dell'autore, nessuno può sfruttare il diritto d'autore. Tra i diritti esclusivi dell'autore
      rientra in particolare il diritto di riproduzione ai sensi dell'art. 10 cpv. 2, lett. a) LDA.

Foglio n. 3

Il diritto esclusivo dell'autore non è assoluto, bensì è soggetto a diverse eccezioni e restrizioni. Ai sensi dell'art. 19 LDA, le opere pubblicate possono essere utilizzate per uso privato. Dei tre casi di uso privato citati dall'art. 19 cpv. 1 LDA, interessa in questa sede solo il caso previsto dall'art. 19 cpv. 1, lett. c) LDA (*utilizzo all'interno dell'azienda*).

In questo senso, per uso privato si intende la riproduzione di esemplari di opere per informazione interna o documentazione, in imprese, amministrazioni pubbliche, istituti, commissioni e enti analoghi. Oggi è fuori discussione che con l'espressione "Riproduzioni di esemplari di opere" ai sensi dell'art. 19 cpv. 1, lett. c) LDA, si debba intendere anche l'utilizzo in forma digitale (Barrelet/Egloff, N. 16 ad art. 19 LDA; corte d'appello di Berna del 21 maggio 2001, "Rassegna stampa elettronica I", sic! 2001, Pag. 613 e segg., 617; Tribunale civile della città di Basilea del 19 giugno 2002, "Rassegna stampa II", sic! 2002, pag. 217 e segg., 221, 222).

Nell'ambito dell'uso privato privilegiato ai sensi di legge, previsto dall'art. 19 cpv. 1, lett. c) LDA, un'opera non può essere riprodotta completamente, ma solo "*ausschnittweise*".

6. Secondo l'art. 19 cpv. 2 LDA chi ha diritto d'utilizzare l'opera per uso privato può farne allestire gli esemplari occorrenti anche da un terzo. La legge indica espressamente come terzi le biblioteche che mettono a disposizione dei loro utenti le macchine fotocopiatrici (art. 19 cpv. 2, 2a frase LDA). *Se sono soddisfatti tutti gli altri presupposti*, VMP può anche essere considerata come terzo ai sensi dell'art. 19 cpv. 2 LDA.

7. L'utilizzo disciplinato nell'art. 19 LDA per quanto riguarda l'uso privato si fonda sul concetto di una *licenza legale*. Nel sistema della licenza legale, la riproduzione di opere protette è consentita, ma con l'obbligo di indennità (art. 20 cpv. 2 LDA). Chi riproduce per uso privato ai sensi dell'art. 19 cpv. 1, lett. b) o c) LDA o chi, in qualità di terzo, riproduce per uso privato ai sensi dell'art. 19 cpv. 2 LDA, opere di qualsiasi genere, è tenuto, ai sensi dell'art. 20 LDA, a versare all'autore una indennità. I diritti all'indennità possono essere fatti valere solo da società di gestione autorizzate (art. 20 cpv. 4, in relazione con l'art. 40 cpv. 1, lett. b) LDA; DTF 124 III 489).

8. Spetta all'utente nel caso specifico verificare se la sua attività ricade nell'ambito della licenza legale o del diritto esclusivo dell'autore. E' un dato di fatto che la VMP ne sia a conoscenza, tanto più che viene consigliata anche da vari avvocati, in particolare la Sig.ra Giovanna Bonafede di Lugano e la Dott.ssa Claudia Bolla di Berna. La Dott.ssa Claudia Bolla è un'esperta in materia, in particolare nel campo del diritto d'autore.

Prove:

doc. 4. Lettera Avv. Bolla-Vincenz/ProLitteris del 2.9.2002

doc. 5. Lettera d'incarico Avv. Bonafede/ProLitteris del 24.11.2004

## III.    Valutazione delle diverse attività di VMP

9.    Da molti anni ProLitteris ritiene che l'invio all'estero di copie (riprodotte in Svizzera) non rientri nell'ambito della licenza legale e della TC 8.

Questa questione, tuttavia, non è stata ancora oggetto di sentenze.

10.    La gestione di una **Banca dati on-line contenente articoli di giornale nella loro versione integrale** non rientra nell'ambito della licenza legale.

11.    Nella licenza legale non è contemplata la **copia integrale (su vasta scala)** di esemplari di opere.

12.    La questione della distinzione tra attività di reprografia e **attività editoriale ("reprints")** non è stata ancora definita in via giudiziale. Se si considera il senso e la finalità dell'art. 19 cpv. 2 LDA (copie per *l'uso privato*), è possibile concludere che il citato disposto prevede una limitazione delle attività consentite: la produzione di riproduzioni palesemente non destinate all'uso privato del committente non rientra quindi nella licenza legale.

## IV.    Esposto cronologico dei fatti

13.    Il rapporto contrattuale tra ProLitteris e VMP è nato con un contratto riprografico sottoscritto il 14 giugno 1989. Il contratto era regolato dalla vecchia legge sul diritto d'autore.

Prove:

doc. 6.  Contratto di reprografia VMP/ProLitteris del 14.6.1989

14.    Questo contratto è stato sostituito da un nuovo contratto riprografico datato 5 ottobre/18 novembre 1996, regolato dalla nuova legge sul diritto d'autore del 1993 e dalla TC 8 entrata in vigore il 1° gennaio 1995.

Prove:

doc. 7.  Contratto di reprografia VMP/ProLitteris del 1996

In base a questo contratto del 1996, VMP era autorizzata a produrre e divulgare copie di opere tutelate dal diritto d'autore per uso privato di terzi (art. 1). Con riferimento alle indennità dovute, il contratto dispone che queste dovevano essere versate in conformità con le disposizioni previste dalla TC 8/VI (art. 1 cpv. 2). Determinate utilizzazioni sono espressamente escluse dall'ambito di applicazione del contratto di reprografia del 1996, vale a dire *la registrazione su supporto dati e la rappresentazione su schermo*. Il contratto prevede espressamente che "*per tutti gli usi non autorizzati dal*

*presente contratto [...], è necessario il consenso del relativo titolare del diritto [...]"* (art. 3).

Per quanto riguarda l'obbligo di indennità della VMP, questo è stato allineato alle disposizioni della TC 8: VMP doveva comunicare una volta all'anno a ProLitteris il numero totale di copie effettuate (art. 5), che costituiva quindi la base di calcolo dell'indennità dovuta (art. 4; cfr. anche TC 8/VI, **Errore. L'origine riferimento non è stata trovata.**, punto 6.3.24.1).

15. ProLitteris ha fatturato a VMP le indennità sulla reprografia sulla base del numero totale di copie comunicato di volta in volta da VMP.

Con riguardo all'eventuale segreto aziendale di VMP, per il momento la ProLitteris non produrrà tali documenti (art. 51 cpv. 2 LDA).

16. Con lettera del 5 agosto 1998, ProLitteris ha fatto presente a VMP che **la registrazione di opere su supporto dati e la rappresentazione su schermo** non erano "espressamente disciplinate" dal contratto riprografico del 1996 (cfr. art. 3).

L'invio di ritagli di giornali via e-mail oppure on-line era tuttavia ammesso e sarebbe stato contemplato nella successiva tariffa comune 9a (TC 9a), nel caso in cui ciò fosse avvenuto *"su richiesta del cliente"* e *"per uso privato"*. Il contratto di reprografia del 1996 sarebbe stato adeguato in tal senso, non appena sarebbe entrata in vigore la "TC9a".

Inoltre, la ProLitteris ha fatto notare espressamente che anche con la nuova "TC 9a" **non** sarebbe stato **consentito** offrire opere tutelate *on-line* per così dire **liberamente**, cioè senza ordine del cliente. I diritti necessari per questo tipo di attività dovevano essere chiesti al titolare del diritto stesso, vale a dire all'autore o all'editore e disciplinati.

Prove:

doc. 8.  Lettera ProLitteris / VMP del 5.8.1998

17. VMP sapeva perfettamente che senza il consenso del titolare dei diritti non avrebbe potuto effettuare "reprints". In un messaggio *e-mail* del 23 novembre 1999, VMP ha infatti comunicato alla Adis International (una casa editrice), che senza l'autorizzazione scritta del titolare dei diritti non avrebbe potuto effettuare "**reprints**" di articoli di giornali.

Prove:

doc. 9.  Scambio di messaggi e-mail tra VMP e Adis International
            del novembre 1999

18. Con scritto del 23 giugno 2000 a tutti i servizi di fornitura di ritagli di giornali e di documentazione e dunque anche alla VMP, ProLitteris comunicava che **l'invio di copie dalla Svizzera all'estero** non era disciplinato dalla legge svizzera, ma era soggetto alla legge del paese di destinazione. Ciò significa chiaramente che ProLitteris non può concedere la licenza per simili attività.

Prove:

doc.10. Lettera ProLitteris/servizi di fornitura di ritagli di giornale e
   di documentazione del 23.6.2000 con allegati (bozza
   contratto di reprografia e relazione della Dott.ssa Magda
   Streuli-Youssef del 13.6.2000)

19. La comunicazione di ProLitteris si fondava su un parere giuridico allestito dalla dr.ssa
Magda Steuli Youssef in data 13 giugno 2000, inviata a tutti i servizi di fornitura di ritagli
di giornale e di documentazione e anche a VMP (cfr. allegato dell'**Errore. L'origine
riferimento non è stata trovata.**). Dal parere risulta che i diritti di reprografia hanno il
loro fondamento giuridico nell'art. 19 LDA e che la legge sul diritto d'autore svizzera
trova applicazione esclusivamente sul territorio dello Stato svizzero.

20. Nell'agosto del 2000, VMP aveva chiesto a ProLitteris una proroga del termine di
disdetta dell'attuale contratto fino al 1° gennaio 2002. VMP fondava questa sua
richiesta sul fatto che ProLitteris le aveva promesso che la durata del contratto sarebbe
stata di almeno sette anni e che quindi sarebbe scaduto solo alla data del 1° gennaio
2002.

Prove:

doc.11. Messaggio *e-mail* VMP/ProLitteris del 16.8.2000

20.1 Con messaggio *e-mail* del 21 agosto 2000, ProLitteris ha negato questa esposizione
dei fatti ed ha chiarito che la promessa relativa alla validità era riferita solo alla TC 8, la
cui validità sarebbe scaduta il 31 dicembre 2001. L'affermazione non riguardava
tuttavia il contratto di reprografia. ProLitteris chiese pertanto a VMP di motivare la sua
richiesta.

Prove:

doc.12. Messaggio e-mail ProLitteris/VMP del 21.8.2000

20.2 In una seconda fase, VMP ha addotto, come motivo della sua richiesta di prorogare il
termine di disdetta, difficoltà economiche di varia natura, che si sarebbe trovata a
fronteggiare a causa di una disdetta del contratto. Infine ProLitteris, "*angesichts der
schwierigen Umstände*" (ovvero in considerazione delle particolari circostanze addotte),
si è dichiarata disposta a disdire il contratto in essere solo con effetto al 31 dicembre
2001. Con lettera del 9 agosto 2001 ProLitteris ha poi prorogato il contratto ancora di
un anno, fino al 31 dicembre 2002. Da allora nel rapporto tra VMP e ProLitteris viene
applicata la TC 8/VI.

Prove:

doc.13. Messaggio e-mail VMP/ProLitteris del 24.8.2000

doc.14  Messaggio e-mail ProLitteris/VMP del 28.8.2000

doc.15  Lettera ProLitteris/VMP del 9.8.2001


21.  Come risulta da un messaggio *e-mail* di ProLitteris al Copyright Clearance Center (Daniel Gervais) di lunedì 30 ottobre 2000, in questa data si è tenuta presso ProLitteris una riunione tra la Sig.ra Franziska Eberhard, vicedirettrice di ProLitteris e il Sig. Robert Gmelig Meyling, amministratore delegato della VMP. Il Sig. Gmelig ha assicurato che VMP non avrebbe consentito in internet l'accesso ad **articoli integrali**, ma avrebbe fornito solo l'indicazione della fonte o un commento. VMP e ProLitteris hanno poi concordato di adeguare il contratto in scadenza alla fine dell'anno, allo scopo di definire esattamente quali attività VMP avrebbe ritenuto di poter svolgere.

Prove:

doc.16. Messaggio *e-mail* ProLitteris/Copyright Clearance Center
del 30.10.2000

22.  In un memo del 25 settembre 2001, VMP scrisse che avrebbe pubblicato „*Angaben von Literatur, also keine ,full text articles'"* (ovvero esclusivamente indicazioni bibliografiche, senza alcun 'articolo integrale') e che tali articoli sarebbero stati inviati agli utenti solo su loro esplicita richiesta.

Prove:

doc.17  Memo VMP/ProLitteris del 25.9.2001


23.  In un messaggio *e-mail* del 25 aprile 2003, VMP ha di nuovo confermato ad un editore di essere a conoscenza del fatto che la produzione di **Reprints**, senza l'autorizzazione del titolare del diritto, non era consentita e che VMP quindi avrebbe chiesto il consenso al titolare del diritto e di volta in volta avrebbe regolato le relative indennità direttamente con il titolare del diritto.

Prove:

doc.18  Messaggio e-mail VMP/Bohn Stafleu Van Loghum bv e
ProLitteris del 25.04. 2003


## V.    Riepilogo

24.  VMP conosce perfettamente i presupposti e le restrizioni dell'uso privato consentito ai sensi dell'art. 19 LDA. Essa ha consultato alcuni avvocati che potevano fornirle informazioni e consigli precisi in tal senso.

25.  ProLitteris ha più volte fatto presente a VMP che per tutte le attività che non rientrano nella licenza legale, è necessario il consenso del titolare del diritto.

26.  VMP non può concludere che ProLitteris le abbia concesso una "autorizzazione" per tutte le attività, basandosi sul fatto che avrebbe versato delle indennità a ProLitteris.

Auspico, gentile Sostituto Procuratore Pubblico, di aver potuto ulteriormente chiarire i fatti e la situazione giuridica.

Rimango, unitamente alla Collega dr.ssa Streuli Youssef, a disposizione per ogni evenienza, rispettivamente per la fornitura di ulteriori informazioni che fossero rilevanti ai fini del procedimento in oggetto.


Con perfetta stima


Avv. dr. Franco Pedrazzini


Allegati: citati (cfr. elenco separato)

## Beilagenverzeichnis

Beilage 1    Statuten der Pro Litteris in der Fassung vom 7. September 2002

Beilage 2    Verfügung des Institutes für Geistiges Eigentum vom 2. Juni 2003, veröffentlicht in: SHAB vom 2.6.2003, Nr. 103

Beilage 3    Tarif GT 8/VI (Reprographie im Dienstleistungsbereich)

Beilage 4    Schreiben RAin Bolla-Vincenz/ProLitteris vom 2.9.2002

Beilage 5    Mandatsanzeige RAin Bonafede/ProLitteris vom 24.11.2004

Beilage 6    Reprographie-Vertrag VMP/ProLitteris vom 14.6.1989

Beilage 7    Reprographie-Vertrag VMP/ProLitteris von 1996

Beilage 8    Schreiben ProLitteris / VMP vom 5.8.1998

Beilage 9    E-Mail-Verkehr zwischen VMP und Adis International vom November 1999

Beilage 10   Schreiben ProLitteris/Dokumentationslieferdienste vom 23.6.2000 inkl. Beilagen (Entwurf Reprographie-Vertrag und Exposé von Dr. Magda Streuli-Youssef vom 13.6.2000)

Beilage 11   Email VMP/ProLitteris vom 16.8.2000

Beilage 12   Email ProLitteris/VMP vom 21.8.2000

Beilage 13   Email VMP/ProLitteris vom 24.8.2000

Beilage 14   Email ProLitteris/VMP vom 28.8.2000

Beilage 15   Schreiben ProLitteris/VMP vom 9.8.2001

Beilage 16   E-Mail ProLitteris/Copyright Clearance Center vom 30.10.2000

Beilage 17   Memo VMP/ProLitteris vom 25.9.2001

Beilage 18   E-Mail VMP/Bohn Stafleu Van Loghum bv und ProLitteris vom 25.04. 2003

LAW AND NOTARY FIRM

# PEDRAZZINI

Atty. Dr. FRANCO PEDRAZZINI, LL.M. and Notary

Registered in the Cantonal Bar

**Registered Letter**
Honorable
Public Prosecutor
Via Pretorio 16
6900 Lugano

Locarno, September 14, 2005

**Inc. no. 2004.9689/AL/AL**
**Action 6.12.2004 – Acta Med – Via Marketing & Promotion SA, Porza**

Honorable Madam Public Prosecutor

I inform you that the undersigned attorney represents, in conjunction with attorney Dr. Magda Streuli Youssef of the law firm Walder Wyss & Partner of Zurich, the cooperative ProLitteris, in the marginal procedure.

As you know, it was possible to obtain, with your agreement, the documents that Attorney Giovanna Bonafede had sent to you on behalf of Via Marketing & Promotions SA (in the rest of the text indicated as "VMP") on May 13, 2005.

The documents sent by Attorney Giovanna Bonafede appear to the evidence to be *incomplete* and therefore they present a one-sided, erroneous and distorted picture of the situation. My client is also aware of the fact that VMP declares that ProLitteris had authorized all of VMP's activities, granting an undefined permit.

This declaration is not at all correct and could bring considerable damages not only to ProLitteris, but also to the owners of the copyrights.

In view of this reason, ProLitteris is amply justified in presenting the necessary amendments and the necessary clarifications by means of this memorandum.

c.c.p. 65-41176-6
via Ciseri 2 B, Palazzo UBS, C.P. 343, CH-6001 LOCARNO 1
Tel: +41 91 751 88 35, Fax: +41 91 751 44 50, avv.pedrazzini@ticino.com

**I.     Regarding the activities of ProLitteris**

1.    ProLitteris, a Swiss Company for copyrights in the field of literary and visual arts, is a cooperative company according to articles 828 and fol. CO. Its headquarters are in Zurich. One of its activities is to protect the copyrights of publishers and other owners of copyrights for literary works and playwrights.

      According to the authorization issued by the Federal Office for Intellectual Ownership on May 23, 2003, Prolitteris is authorized and bound to assert the rights issued by articles 13, 20 and 22 of the Federal Law on Copyrights and other similar Protecion Rights (from now on: LDA).

      <u>Evidence:</u>

      doc. 1.  Articles of Association of ProLitteris, edition September 7, 2002

      doc. 2.  Act of the Federal Office for Intellectual Ownership (IPI) of June 2, 2003, published in the Swiss Business Gazette of June 2, 2003, n. 103

2.    The indemnity rights given by ProLitteris are based on fees approved by the Federal Arbitration Commission for the management of copyrights and similar rights (CAF) (cf. art. 46 LDA), binding for the tribunals (art. 59 § 3 LDA).

3.    Since VMP, according to the information she has given, produces reproductions of journal articles on behalf of its clients, in principle it is Common Tariff 8 (in the rest of the text indicated as "TC 8") that is applicable, partial tariff VI (reprography in the service sector). In this session we present tariff TC 8/VI effective from January 1, 2002 to December 31, 2006, with particular reference to points 6.3.24.1 and fol. of the tariff.

      <u>Evidence:</u>

      doc. 3.  Tariff TC 8/VI (Reprography in the service sector)

**II.    The legal system for the utilization of a work for private use**

4.    Every user must verify whether his/her own specific case falls within the parameters of the right for the utilization of a work for private use according to article 19 LDA or within the exclusive rights of the author according to article 10 LDA. ProLitteris does not issue any kind of authorization in this matter to those who utilize the works.

5.    LDA issues a series of exclusive rights to the author. Normally, without the authorization from the author, no one is allowed to exploit the copyrights. Among the

exclusive rights issued to the author, there is in particular the right to reproduction according to article 10 § 2, let. a) LDA.

The exclusive rights of the author are not absolute, but they are subjected to several restrictions and exceptions. According to art. 19 LDA, published works can be utilized for private use. Article 19 § 1 LDA mentions three cases, in this matter the only pertinent one is the case mentioned in art. 19 § 1, let. c) LDA (*use within a firm*).

In this case, by private use we mean the reproduction of samples of works for internal information or documentation, in enterprises, public administrations, institutes, commissions, and similar agencies. It is out of the question now that the expression "Reproductions of samples of works" according to art. 19 § 1, let. c) LDA, includes the use by digital format (Barrelet/Egloff, N. 16, art. 19 LDA; Court of Appeal of Berne, May 21, 2001, "Review on electronic printing I", sic! 2001, Pg. 613 and fol., 617; Civil Court of the City of Basel, June 19, 2002, "Review on printing II", sic! 2002, pg. 217 and fol., 221, 222).

Within the legal privileged private use, according to art. 19 § 1, let. c) LDA, a work may not be reproduced in its entirety, but only *"ausschnittweise"*.

6.    According to art. 19 § 2 LDA, the person who has the right to utilize the work for private use, may prepare the samples needed by a third party. The Law explicitly indicates as third party the libraries that give access to photocopy machines to their patrons (art. 19 § 2, 2nd sentence LDA). *If other premises are also met,* then VMP could be considered a third party according to art. 19 § 2 LDA.

7.    The utilization, as established by art. 19 LDA regarding private use, is based on the concept of *a legal license*. Within the system of legal license, the reproduction of protected works is allowed, however with compulsory payment of compensation (art. 20 § 2 LDA). The user who reproduces for private use according to art. 19 § 1, let. b), or c) LDA, or who, as a third party, reproduces for private use according to art. 19 § 2 LDA, works of any kind, must, according to art. 20 LDA, pay to the author a compensation fee. The rights to compensation fees can be implemented only by authorized managing agencies (art. 20 § 4, relating to art. 40 § 1, let. b) LDA; DTF 124 III 489).

8.    It is the responsibility of the user in each specific case to verify whether his activities are within the limits of the legal license or those of the exclusive rights of the author. It is certain that VMP is aware of this, especially in view of the fact that it receives counsel from several lawyers, and specifically from Mrs. Giovanna Bonafede of Lugano and Dr. Claudia Bolla of Berne. Dr. Claudia Bolla is an expert in the subject, especially with regards to copyrights.

Evidence:

doc. 4.  Letter Attorney Bolla-Vincenz/ProLitteris dated Sptember
         2, 2002

doc. 5.  Appointment Letter Attorney Bonafede/ProLitteris dated
         November 24, 2004

## III.    Evaluation of the various activities of VMP

9.   For many years ProLitteris has held the belief that shipping copies (reproduced in
     Switzerland) to foreign countries does not fall within the boundaries of the legal license
     as per TC 8.

     However, this issue has not been the object of a sentence yet.

10.  The management of an **online Database that includes journal articles with full text**
     does not fall within the boundaries of a legal license.

11.  The legal license does not provide for **full text copies of works (on a large scale).**

12.  The issue of the difference between reprography activities and **editorial activities
     ("reprints")** has not been defined in a legal manner.  If we consider the meaning and
     the purpose of article 19 § 2 LDA (copies for *private use*), we may conclude that the
     above mentioned disposition entails a limitation of the permitted activities: the
     production of reproductions that are not manifestly for the private use of the customer
     are therefore outside the boundaries of the legal license.

## IV.    Chronological description of the facts

13.  The business relationship between ProLitteris and VMP began with a reprography
     contract undersigned on June 14, 1989. This contract was governed by the old
     copyrights law.

     Evidence:

     doc. 6.  Reprography contract   VMP/ProLitteris dated June 14,
              1989

14.  This contract was substituted by a new reprography contract on date October 5
     /November 18, 1996, governed by the new copyrights law of 1993 and by TC 8, which
     came into effect on January 1st, 1995.

Evidence:

doc. 7.  Reprography contract  VMP/ProLitteris dated  1996


According to this contract of 1996, VMP was authorized to reproduce and distribute copies of works protected by copyrights for private use by a third party (art. 1). Regarding the compensation fees, the contract declares that the fees had to be paid according to the regulations established by TC 8/VI (art. 1 § 2). Specific utilizations are explicitly excluded from the reprography contract of 1996,  and they are *recording in a database and display on a monitor*. The contract explicitly declares that  *"for all utilizations that are not authorized by this contract [...], it is necessary to obtain the permission of the owner of the copyrights [...]"* (art. 3).

Regarding the legal obligations of VMP to pay fees, they have been aligned with the provisions of TC 8: VMP was supposed to report once a year to ProLitteris the total number of copies made (art. 5), thus creating the basis for calculating the amount of the fees to be paid (art. 4; cfr. anche TC 8/VI, **Error! Reference source not found.**, point 6.3.24.1).

15. ProLitteris invoiced VMP for reprographic fees on the basis of the total number of copies given each time by VMP.

    Regarding the possible right to administrational privacy of VMP, for the time being ProLitteris will not produce such documents (art. 51 § 2 LDA).

16. With a letter dated August 5, 1998, ProLitteris let VMP know that **recording of works on a database and their display on monitors** were not "explicitly governed" by the reprography contract of 1996 (cf. art. 3).

    However, shipment of newspaper cuttings via e-mail or on-line was allowed and would be included later in the common tariff 9a (TC 9a), in the case that it was done *"per client's request"* and *"for private use"*. Under those circumstances the reprography contract of 1996 would have been sufficient, as soon as "TC9a" had come into force.

    Moreover, ProLitteris explicitly indicated that even with the new "TC 9a" it would **not** be **allowed** to offer protected works *online*, **liberally**, that is without an order from a client. The rights for such kind of activity had to be requested from the owner of those rights, in other words from the author or publisher.

    Evidence:

    doc. 8.  Letter ProLitteris / VMP dated August 5, 1998


17. VMP had perfect knowledge of the fact that without permission from the owner of the copyrights it could not make "reprints". In an *e-mail* message November 23, 1999, VMP in fact communicated to Adis International (a publishing house), that without written authorization from the owners of the copyrights it could not make "**reprints**" of journal articles.

Evidence:

doc. 9. E-mail message exchanges between VMP and Adis
International in November 1999

18. With a note dated June 23, 2000 to all the service businesses for supply of newspaper
cuttings and documentations, and therefore also addressed to VMP, ProLitteris
informed them that **shipment of copies from Switzerland to abroad** was not
governed by Swiss law, but by the laws of the Country of destination. This clearly
shows that ProLitteris cannot issue a license for such activities.

Evidence:

doc.10. Letter ProLitteris/service businesses for supply of
newspaper cuttings and documentations dated June 23,
2000 with attachments (draft of reprography contract and
report by Dr. Magda Streuli-Youssef dated June 13,
2000)

19. The notification from ProLitteris was based on the legal opinion expressed by Dr.
Magda Steuli Youssef on June 13, 2000, sent to all suppliers of newspaper cuttings
and documentations, and also to VMP (cf. attachment of **Error! Reference source not
found.**). from this legal opinion it appears that reprography rights have a judicial basis
in art. 19 LDA and the Swiss law for copyrights is applied exclusively within the territory
of the Swiss State.

20. In August 2000, VMP requested from ProLitteris an extension of the deadline for
expiration of the contract until January 1st, 2002. VMP based this request on the fact
that ProLitteris had promised that the duration of the contract would be at least seven
years, and therefore it would expire only on January 1st, 2002.

Evidence:

doc.11. E-mail message VMP/ProLitteris dated August 16, 2000

20.1 With an *e-mail* message dated August 21, 2000, ProLitteris denied this statement of
facts, and clarified that the promise made regarding the validity was only in reference to
TC 8, whose validity would expire on December 31, 2001. Such declaration, however,
did not involve the reprography contract. ProLitteris therefore asked VMP to present
other reasons for its request.

Evidence:

doc.12. E-mail message ProLitteris/VMP dated August 21, 2000

20.2 In a second phase, VMP presented as a reason for its request of postponement of the expiration date financial difficulties of various nature that would be encountered because of the expiration of the contract. Finally ProLitteris, "*angesichts der schwierigen Umstände*" (that is in consideration of the particular circumstances that were presented), agreed to cancel the contract only on December 31, 2001. With a letter dated August 9, 2001, ProLitteris extended the contract for one more year, until December 31, 2002. Since then, the relationship between VMP and ProLitteris has been regulated by the application of TC 8/VI.

Evidence:

doc.13. E-mail message VMP/ProLitteris dated August 24, 2000

doc.14  E-mail message ProLitteris/VMP dated August 28, 2000

doc.15  Letter ProLitteris/VMP dated August 9, 2001


21.  As it appears from an *e-mail* message from ProLitteris to the Copyright Clearance Center (Daniel Gervais) dated Monday October 30, 2000, on this day there was a meeting in the ProLitteris offices between Mrs. Franziska Eberhard, vice director of ProLitteris and Mr. Robert Gmelig Meyling, managing director of VMP. Mr. Gmelig assured that VMP would not allow internet access to **full text articles**, but would only offer the indication of the source or a comment. VMP and ProLitteris then agreed to modify the contract expiring at the end of the year, in order to define exactly which activities VMP would consider possible to carry out.

Evidence:

doc.16. E-mail message ProLitteris/Copyright Clearance Center
        dated October 30, 2000

22.  In a memo dated September 25, 2001, VMP wrote that it would publish „*Angaben von Literatur, also keine ‚full text articles'*" (that is exclusively biographical notes, without any 'full text articles') and that such articles would be sent to the clients only under their specific request.

Evidence:

doc.17  Memo VMP/ProLitteris dated September 25, 2001


23.  In an *e-mail* message dated April 25, 2003, VMP confirmed again to a publisher to be aware of the fact that producing **Reprints**, without the authorization from the owner of the copyrights was not allowed, and VMP would request authorization from the owner of the copyrights and would each time pay the relative fees directly to the owner of the copyrights.

Evidence:

doc.18  E-mail message VMP/Bohn Stafleu Van Loghum bv and
          ProLitteris dated April 25,  2003

## V.    Recapitulation

24.   VMP has perfect knowledge of the premises and restrictions regarding the private use allowed according to art. 19 LDA. VMP has consulted several lawyers that could have given information and specific advise on the matter.

25.   ProLitteris has repeatedly notified VMP that all the activities that are not within the limits of the legal license require the authorization of the owner of the copyrights.

26.   VMP cannot conclude that it was issued an "authorization" by ProLitteris for all of the activities, based on the fact that VMP paid some compensation fees ProLitteris.

I hope, Honorable Deputy Public Prosecutor, that I have been able to further clarify the facts and the legal position.

My colleague, Dr. Streuli Youssef, and I remain available, respectively, for any possible need and further information that might be of importance for these proceedings.

                                        Respectfully,

                                        Attorney Dr. Franco Pedrazzini

Attachments: mentioned (cf. Separate list)

# ►ProLitteris

DIREKTION

**An alle Dokumentationslieferdienste**

Kündigung / Neuer Vertrag zwischen Dokumentationslieferdienst und ProLitteris

<span style="float:right">23<br>06<br>200₁</span>



**Sehr geehrte Damen und Herren**

Nachdem Dokumentationslieferdienste mit Sitz in der Schweiz immer häufiger auch Kopien ins Ausland versenden, erlauben wir uns, Ihnen ein Kurzgutachten über die juristische Situation zuzusenden. Daraus ersehen Sie, dass das Versenden von Kopien von der Schweiz aus ins Ausland nicht durch das Schweizer Gesetz geregelt und erlaubt ist, dass es vielmehr auf das Recht ankommt, das im Adressland gilt. Solche Kopien können nicht durch die ProLitteris lizenziert werden. Auch die Gegenseitigkeitsverträge, welche die ProLitteris mit Schwestergesellschaften im Ausland abgeschlossen hat, erlauben für das Gebiet der Schweiz nur das, was nach Schweizer Gesetz gilt.

Wir sehen uns aufgrund dieser rechtlichen Situation gezwungen, hiermit die bisherigen Verträge auf den 31.12.2000 zu kündigen. Als Beilage senden wir Ihnen einen neuen Vertrag im Doppel, der den erwähnten Umständen Rechnung trägt und ab 1.1.2001 gelten wird. Gegenüber dem bisherigen Vertrag sind insbesondere folgende Abschnitte ergänzt worden:



**Ziffer 2:**

> Die Erlaubnis bezieht sich nur auf das Anbieten, Herstellen und Verbreiten der Kopien auf dem Gebiet der Schweiz an die gemäss Art. 19 Abs. 1 und 2 URG Berechtigten.

**Ziffer 3:**

> Das Anbieten, Herstellen, Verbreiten von elektronische/digitalen Vervielfältigungen über Internet oder mittels anderen elektronischen oder digitalen Mitteln (online- und offline Nutzungen),
> - innerhalb der Schweiz,
> - von der Schweiz aus ins Ausland,
> - im Ausland
> ist von der vorliegenden Erlaubnis nicht umfasst.
> Für alle durch diesen Vertrag oder durch den künftigen Gemeinsamen Tarif 9 nicht erlaubten Verwendungen ist die ausdrückliche Erlaubnis der betreffenden Rechtsinhaber und Rechtsinhaberinnen erforderlich.

Universitätstrasse 94–96
Postfach, 8033 Zürich
Tel (01) 368 15 15
Fax (01) 368 15 68
www.prolitteris.ch
mail@prolitteris.ch

Schweizerische
Urheberrechtsgesellschaft

▶ProLitteris

**Ziffer 7:**

> Jedes Anbieten, Herstellen, Verbreiten von Kopien von der Schweiz aus ins Ausland und im Ausland ist von der Freistellung nicht mitumfasst.

**Ziffer 10:** Neu gilt als Gerichtsstand in jedem Fall Zürich.

Aufgrund der geschilderten Rechtslage klärt die ProLitteris zur Zeit ab, ob mit anderen ausländischen Schwestergesellschaften eine Vereinbarung getroffen werden kann, wonach wir diese Rechte unter Beachtung der ausländischen Gesetzgebung künftig allenfalls trotzdem vertreten können.

Der vorliegende Vertrag regelt das Herstellen und Versenden von Papierkopien (vgl. Ziffer 1 des Vertrages). Das Versenden von elektronischen/digitalen Kopien (z.B. über E-mail) wird im Gemeinsamen Tarif 9 geregelt werden. Infratest führt zur Zeit eine Erhebung zu dieser neuen Form der Nutzung durch. Anschliessend wird die ProLitteris mit den massgebenden Nutzerverbänden der Schweiz einen Tarif aushandeln. Wir werden Sie über diesen Tarif informieren, sobald er rechtskräftig ist.

Soweit Sie mit unserem neuen Vertragsvorschlag einverstanden sind, bitten wir Sie, beide Exemplare unterschrieben an uns zurückzusenden. Sie erhalten anschliessend ein von uns gegengezeichnetes Vertragsexemplar.

Wir hoffen, Ihnen mit diesen Angaben gedient zu haben.

Für allfällige Fragen stehen wir Ihnen gerne zur Verfügung.

Freundliche Grüsse
ProLitteris

Franziska Eberhard
Vizedirektorin

- 2 -

**Reprographie-Vertrag**

zwischen

Via Marketing & Promotion SA, Via Privata, Sommaruga 21F, 6900 Lugano



– nachstehend „Dokumentationslieferdienst" genannt

und

ProLitteris, Schweizerische Urheberrechtsgesellschaft für Literatur und bildende
Kunst, Universitätstrasse 96, 8006 Zürich,

– nachstehend „ProLitteris" genannt



## 1  Vertragszweck

Durch diesen Vertrag erteilt die ProLitteris dem Dokumentationslieferdienst die
Bewilligung, mittels der in seinem Besitze stehenden Vervielfältigungsgeräte
(Photokopierapparate, Telefaxgeräte, Laserdrucker etc.) Kopien von
urheberrechtlich geschützten Werken herzustellen und zu verbreiten.

Die Via Marketing & Promotion SA als Dokumentationslieferdienst im Sinne von
Ziffer 6.3.25 des Gemeinsamen Tarifs 8/ VI verpflichtet sich, Vergütungen nach
den im geltenden Gemeinsamen Tarif 8/VI enthaltenen Bestimmungen zu
entrichten.

## 2   Umfang der Erlaubnis

Die durch diesen Vertrag gewährte Erlaubnis der ProLitteris bezieht sich auf folgende Verwendungen:

- auf das gesetzlich erlaubte Vervielfältigen geschützter und veröffentlichter Werke innerhalb des Eigengebrauches gemäss Art. 19 URG;



- auf das Vervielfältigen geschützter und veröffentlichter Werke der bildenden Kunst innerhalb des Eigengebrauches gemäss Art. 19 Abs. 1 lit. b) und c) und Art. 19 Abs. 2 URG;

- auf das Vervielfältigen graphischer Aufzeichnungen von Werken der Musik (Musiknoten) innerhalb des Eigengebrauches gemäss Art. 19 Abs. 1 lit. b) und c) und Art. 19 Abs. 2 URG;

- auf das Vervielfältigen und das unentgeltliche Inverkehrbringen geschützter und veröffentlichter Werke ausserhalb des Eigengebrauches gemäss Art. 10 Abs. 2 lit. a) und b) URG; (miteingeschlossen ist dabei auch das Vervielfältigen und unentgeltliche Inverkehrbringen von veröffentlichten und geschützten Werken der bildenden Kunst);

- auf das Vervielfältigen von Zeitungs- und Zeitschriftenartikeln und auf das entgeltliche Inverkehrbringen dieser Kopien gemäss Art. 10 Abs. 2 lit. a) und b) URG.

Die Erlaubnis bezieht sich nur auf das Anbieten, Herstellen und Verbreiten von Kopien auf dem Gebiet der Schweiz an die gemäss Art. 19 Abs. 1 und 2 URG Berechtigten.

## 3   Ausgeschlossene Verwendungen

Das Anbieten, Herstellen, Verbreiten von elektronische/digitalen Vervielfältigungen über Internet oder mittels anderer elektronischen oder digitalen Mitteln (online- und offline Nutzungen),
-   innerhalb der Schweiz,
-   von der Schweiz aus ins Ausland,
-   im Ausland
ist von der vorliegenden Erlaubnis nicht umfasst.

Für alle durch diesen Vertrag oder durch den künftigen Gemeinsamen Tarif 9 nicht erlaubten Verwendungen ist die ausdrückliche Erlaubnis der betreffenden Rechtsinhaber und Rechtsinhaberinnen erforderlich. Dies gilt insbesondere für

- das vollständige oder weitgehend vollständige Vervielfältigen im Handel erhältlicher Werkexemplare und

- für das Verändern oder Bearbeiten der zu vervielfältigenden Werke.

## 4   Vergütungen

Die jährlichen Vergütungen, welche der Dokumentationslieferdienst für die Verwendungen gemäss Ziffer 2 zu bezahlen hat, errechnen sich anhand

- der Entschädigungen von 3, 5 Rappen pro Kopie,
- des Branchenkoeffizienten von 70 % und
- der vom Dokumentationslieferdienst im betreffenden Jahr angefertigten Gesamtkopiemenge.

## 5   Meldungen

Der Dokumentationslieferdienst ist verpflichtet, der ProLitteris bis jeweils Ende Januar eines jeden Jahres die Gesamtkopiemenge zu melden.

Werden die von der ProLitteris erbetenen Angaben auch nach einer schriftlichen Mahnung innert Nachfrist nicht eingereicht, kann die ProLitteris die Angaben schätzen, und gestützt auf diese Schätzungen, entsprechend Rechnung stellen.



**6   Abrechnung**

Die ProLitteris stellt dem Dokumentationslieferdienst gestützt auf dessen Meldung Rechnung für das laufende Jahr.

Die Rechnungen der ProLitteris sind innert 30 Tagen zahlbar. Für fällige Vergütungen hat die ProLitteris einmal schriftlich zu mahnen.



**7   Freistellung**

Der Dokumentationslieferdienst wird mit der Zahlung der Vergütungen von Forderungen Dritter im Rahmen der durch diesen Vertrag abgedeckten Vervielfältigungen für das Gebiet der Schweiz freigestellt.

Jedes Anbieten, Herstellen, Verbreiten von Kopien von der Schweiz aus ins Ausland oder im Ausland ist von der Freistellung nicht mitumfasst.

Der Dokumentationslieferdienst verpflichtet sich, allfällige Anspruchsteller direkt an die ProLitteris zu verweisen und sich einer Vereinbarung mit diesen zu enthalten.

**8   Gemeinsamer Tarif 8/VI**

Die Bestimmungen des Gemeinsamen Tarifs 8/VI bilden einen integrierenden Bestandteil dieses Vertrages.

**9   Gültigkeitsdauer**

Dieser Vertrag tritt ab 1.1.2001 in Kraft. Er kann von jeder Vertragspartei auf Ende eines Jahres mit dreimonatiger Kündigungsfrist gekündigt werden.

## 10  Gerichtsstand

Für Klagen des Dokumentationslieferdienstes gegen die ProLitteris aus diesem Vertrag sind die Gerichte in Zürich zuständig.

Für Klagen der ProLitteris gegen den Dokumentationslieferdienst aus diesem Vertrag sind ebenfalls die Gerichte in Zürich anzurufen.



Zürich, den ................................    ................ ,den ....................

.............................................    .............................................
ProLitteris                                      Via Marketing & Promotion SA

Juni 2000/lh

# Hess · Streuli · Wiget

Rechtsanwälte

Dr. iur. Niklaus Wiget
Dr. iur. Magda Streuli-Youssef
Dr. iur. Markus Hess
Dr. oec. publ. Ivo P. Baumgartner*
Dr. iur. Daniel Alder
Dr. iur. Brigitte Tanner
Lic. iur. Peter Schatz LL.M.

\* dipl. Steuerexperte (nicht Rechtsanwalt)

ProLitteris
Frau Franziska Eberhard
Universitätstrasse 96
Postfach
8033 Zürich

Zürich, 13. Juni 2000
MS/kp



**Exposé zur Frage der Wirkung der Reprographieerlaubnis gemäss Art. 19 und 20 URG in geographischer Hinsicht**

Sehr geehrte Frau Eberhard

Ich nehme Bezug auf unsere Besprechung vom 13. April 2000 und fasse hiermit das Ergebnis meiner Abklärungen zur Wirkung der Reprographieerlaubnis der ProLitteris gemäss Art. 19 und 20 URG wie folgt zusammen.

## A.    Einleitende Bemerkungen



### 1.    Die gesetzliche Grundlage: Art. 19 und 20 URG

Der Einfachheit halber gebe ich zum besseren Verständnis nachfolgend den Wortlaut von Art. 19 Abs. 2 und von Art. 20 Abs. 2 und 4 URG wieder.

Art. 19 Abs. 2 URG lautet wie folgt:

"Wer zum Eigengebrauch berechtigt ist, darf die dazu erforderlichen Werkexemplare auch durch Dritte herstellen lassen; als Dritte im Sinne dieses Absatzes gelten auch Bibliotheken, die ihren Benützern Kopiergeräte zur Verfügung stellen".

2

Art. 20 Abs. 2 URG hat folgenden Wortlaut:

> "Wer zum Eigengebrauch nach Art. 19 Absatz 1 Buchstabe b oder Buchstabe c oder wer als Drittperson nach Artikel 19 Absatz 2 Werke auf irgendwelche Art vervielfältigt, schuldet dem Urheber oder der Urheberin hiefür eine Vergütung".

Art. 20 Abs. 4 URG hat folgenden Wortlaut:

> "Die Vergütungsansprüche können nur von zugelassenen Verwertungsgesellschaften geltend gemacht werden".



**B.    Allgemeines**

**1.    Das System der gesetzlichen Lizenz**

Die Reprographierechte haben ihre Grundlage in Art. 19 URG. Art. 19 URG sieht eine gesetzliche Lizenz vor. Im System der gesetzlichen Lizenz ist das Kopieren von geschützten Werken erlaubt, aber vergütungspflichtig (Art. 20 Abs. 2 URG). Die Vergütungsansprüche können nur von zugelassenen Verwertungsgesellschaften geltend gemacht werden. Für die Einziehung der "Reprographierechte" in der Schweiz ist die Verwertungsgesellschaft ProLitteris zuständig.



**2.    Anwendbarkeit bzw. räumlicher Geltungsbereich des URG**

Das schweizerische URG (Bundesgesetz über das Urheberrecht und verwandte Schutzrechte vom 9. Oktober 1992) gilt ausschliesslich für den Schutz von Werken auf schweizerischem Hoheitsgebiet. Dies ergibt sich aus dem **Territorialitätsprinzip** (Katzenberger, in: Schricker, Urheberrecht, 2. Aufl. München 1999, Rdn. 120 ff vor §§ 120 ff.; Cherpillod, in SIWR II/1, Basel 1995, S. 37; ZR 97 (1998) Nr. 112, S. 293 ff. = sic! 1999, S. 138 ff.). Das Territorialitätsprinzip schränkt den Geltungsbereich eines Schutzrechtes auf das

3

jeweilige Land ein. Daran ändert der Vorbehalt völkerrechtlicher Verträge in Art. 1 Abs. 2 URG m.E. nichts. Weder RBÜ, WUA nocht TRIPS enthalten anderslautende Bestimmungen.

Die Tätigkeit der ProLitteris, welche im verwertungsgesellschaftspflichtigen Bereich ihre Grundlage unmittelbar im URG hat, bezieht sich nur auf Rechte in der Schweiz und umfasst ausschliesslich Rechtseinräumungen für die Schweiz. Infolgedessen ist die Wirkung einer "Reprographieerlaubnis" auf das Gebiet der Schweiz beschränkt. Die ProLitteris kann einem Dokumentationsdienst nur eine Lizenz zur Herstellung von Kopien in der Schweiz und nur für die Weitergabe der Kopien an Kunden in der Schweiz (= Nutzer) erteilen. Die aufgrund der Kopiererlaubnis der ProLitteris hergestellten Kopien dürfen nur in der Schweiz angeboten und vertrieben werden. Das Anbieten, Verbreiten und Versenden ins Ausland (auch über Internet) ist von der Kopiererlaubnis der ProLitteris nicht gedeckt. Für die Anknüpfung an das schweizerische Recht ist daher entscheidend, dass die Vervielfältigung und die Nutzung des Werkes in der Schweiz erfolgen.

Daraus folgt, dass die Kopiererlaubnis der ProLitteris die Nutzung von in der Schweiz hergestellten Kopien im Ausland nicht mitumfasst. Man kann dies etwa wie folgt kurz zusammenfassen: Fotokopien für die Nutzung in der Schweiz sind bei der ProLitteris zu lizenzieren, dagegen kann man Fotokopien für die Nutzung im Ausland nicht bei der ProLitteris lizenzieren.

In diesem Zusammenhang ist darauf hinzuweisen, dass die Gegenseitigkeitsverträge mit ausländischen Schwestergesellschaften nicht mehr Rechte verleihen als die Rechte, die auf dem Gebiet der Schweiz gelten.

**3.    Die Bedeutung von Art. 19 und 20 URG**

Mit der Umschreibung "Wer zum Eigengebrauch befugt ist" von Art. 20 Abs. 2 URG ist gemeint, "wer zum **Eigengebrauch nach schweizerischem Recht** befugt ist". Die Tatsache, dass die Vergütungspflicht von Art. 20 Abs. 2 URG ausdrücklich an die durch Art. 19 URG eingeräumte Befugnis zum Kopieren

4

anknüpft, ist ein weiterer Hinweis dafür, dass mit der Befugnis die gesetzliche Lizenz in Art. 19 URG gemeint ist, welche ihre Wirkung nur für die Schweiz entfalten kann. Wer zum Eigengebrauch befugt ist, bestimmt sich daher nach schweizerischem Recht.

Auch hier greift wieder das Territorialitätsprinzip, aus welchem folgt, dass der Schutz aus dem URG für das Gebiet der Schweiz gilt und geographisch auf die Schweiz beschränkt ist. Entfaltet das schweizerische URG seine Wirkungen nur auf dem Territorium der Schweiz, heisst dies, dass die vom Gesetz in Art. 19 URG verliehene Befugnis und damit auch die Reprographieerlaubnis nur Wirkungen für die Schweiz haben kann. Dies bedeutet, dass nur Nutzer mit Sitz und Tätigkeit in der Schweiz sich auf den Eigengebrauch von Art. 19 URG berufen können. Als Dritte im Sinne von Art. 19 Abs. 2 URG gelten nur Dokumentationsdienste mit Sitz und Tätigkeit in der Schweiz.



Ausdruck des Territorialitätsprinzips ist auch die Bestimmung von Art. 20 Abs. 4 URG. Diese sieht vor, dass die nach Art. 20 Abs. 2 URG geschuldeten Vergütungsansprüche nur von zugelassenen Verwertungsgesellschaften geltend gemacht werden können. Als Verwertungsgesellschaften sind gestützt auf Art. 42 Abs. 1 lit. a URG nur Gesellschaften zugelassen, die nach schweizerischem Recht gegründet wurden, ihren Sitz in der Schweiz haben und ihre Geschäfte von der Schweiz aus führen. Nach Barrelet/Egloff (Das neue Urheberrecht, Bern 1994, N 3 zu Art. 42 URG) wird mit Art. 42 Abs. 1 lit. a URG der Grundsatz der Territorialität verankert, "welcher die Kollektivverwertung von Urheberrechten in der ganzen Welt dominiert".



Schliesslich geht auch aus der Bewilligung des Eidgenössischen Institutes für Geistiges Eigentum vom 26. Mai 1998 hervor (Vgl. SHAB Nr. 103 vom 2. Juni 1998), dass sich die an die ProLitteris erteilte Befugnis auf die Einziehung der Ansprüche aus Art. 13, 20 und 22 URG und damit auf die Einziehung von Ansprüchen nach schweizerischem Recht bezieht.

5

**4.    Angebote über Internet**

Das Führen einer Liste von Werken, auch auf einer WebSite, stellt keine urheberrechtlich relevante Nutzung, d.h. keine Vervielfältigung dar, solange die Werke selbst am Bildschirm nicht wahrnehmbar gemacht werden. Insoweit ist dieser Vorgang unbedenklich.

Allerdings muss ich einen **Vorbehalt** anbringen. Dieser bezieht sich auf **Angebote, Kopien ins Ausland zu verschicken.**



Auch wenn das Einspeisen einer Liste von Werken auf einer WebSite in der Schweiz oder von der Schweiz aus erfolgt, ist ein solches Angebot auf einer WebSite unter Umständen auch als Angebot ins Ausland zu qualifizieren, weil es über das World Wide Web überall aufgerufen werden kann.

Als Umstände, die bei der Bestimmung der geographischen Reichweite eines Angebotes zu würdigen sind, sind etwa zu nennen:

Verwendungszweck oder Natur des Angebotes: bei einem Angebot für ein schnellverderbliches Produkt oder für einen Lebensmittel-Hauslieferdienst kann man eher auf eine lokale Verbreitung schliessen. Beim Angebot eines Dokumentationsdienstes kann **nicht** per se auf eine bloss nationale Verbreitung geschlossen werden. Es ist daher Sache des Anbieters, durch technische Vorkehren sicherzustellen, dass Bestellungen aus dem Ausland (d.h. Bestellungen, bei welchen die rechtlich relevante Nutzung im Ausland erfolgen soll) nicht ausgeführt werden.



die Internet-Adresse des Anbieters: eine Top Level Domain ".ch" kann (im Gegensatz etwa zu einer Top Level Domain ".com") ein Hinweis für die Ausrichtung auf den schweizerischen Markt sein;

die Währung, in welche die Preise angegeben werden. Werden die Preise nur in CHF angegeben, kann dies ein Anhaltspunkt für eine bloss lokale (nationale) Verbreitung eines Angebotes sein.

6

**C.    Beurteilung von grenzüberschreitenden Rechtsverletzungen**

Bei Katzenberger (Kommentar Schricker, Rdn. 136 vor §§ 120 ff) habe ich einen
Hinweis gefunden, der praktisch auf unsere Fragestellung zutrifft. Katzenberger
führt aus, dass aus der Selbständigkeit des Vervielfältigungsrechts folgt, dass
eine Verletzung dieses Rechts auch dann angenommen werden kann, wenn die
im Inland vorgenommene Vervielfältigung eines geschützten Werkes in der
Absicht geschieht, die Vervielfältigungsstücke ins Ausland zu exportieren und
erst dort zu verbreiten, d.h. wenn der **Nutzer** im Ausland ist.



Gerne hoffe ich, Ihnen mit diesen Ausführungen gedient zu haben. Sollten Sie Fragen
haben, stehe ich Ihnen zur Verfügung.

Mit freundlichen Grüssen

Dr. Magda Streuli-Youssef

ProLitteris
Management

To all Documentation Supply Services

Cancellation / new agreement between Documentation Supply Service and ProLitteris

Dear Sir and Madam,

We are sending you an expert report about the legal situation, because Documentation Supply
Services, headquartered in Switzerland, are sending more and more copies abroad. The expert
report states that the sending of copies from Switzerland to countries abroad is not regulated and
permitted by Swiss law, and that it more importantly depends on the law of the receiving country.
Even reciprocity agreements, which have been established between ProLitteris and its subsidiaries
abroad, permit for the Swiss territory only that, what is allowed according to Swiss law.

This legal situation forces us to cancel all existing agreements effective 12/31/2000. Attached is a
new agreement (two copies) which takes the mentioned circumstances into consideration and it will
be effective as of 1/1/2001. The following parts have been supplemented as compared to the
existing agreement:

Item 2:

| |
|---|
| The licence covers offering, production and distribution of copies in the territory of Switzerland to beneficiaries in accordance with article 19 paragraph 1 and 2 URG. |

Item 3:

| |
|---|
| Offering, production and distribution of electronic/digital copies on the Internet or through other electronic or digital media (online or offline usage)<br>- within Switzerland,<br>- from Switzerland into foreign countries,<br>- in foreign countries<br>are not included in the present licence.<br>An explicit approval of the copyright holder is required for all applications that are not licenced by this contract or by the future Gemeinsamen Tarif 9 [Common Tariff 9]. |

Universitätstrasse 94-96
Postfach, 8033 Zürich
Tel (01) 368 15 15
Fax (01) 368 15 68
www.prolitteris.ch
mail@prolitteris.ch

Swiss copyright association for literature

Item 7:

> Offerings, production and distribution of copies from Switzerland into a foreign country and in the foreign are not covered by the release.

Item 10: Jurisdiction is always Zürich.

ProLitteris is currently clarifying, based on the legal situation described, whether an agreement can be established with other foreign subsidiaries, which would allow us to represent these rights in accordance with the foreign law.

The present agreement regulated the production and distribution of paper copies (see item 1 of the agreement). The sending of electronic/digital copies (e.g. by Email) will be covered by the Gemeinsamen Tarif 9 [Common Tariff 9]. Infratest is currently executing a survey regarding this new usage type. ProLitteris will subsequently negotiate a new tariff with the proper user associations in Switzerland. We will inform you about this new tariff once it is legally binding.

Please send both copies signed back to us, if you agree with our new agreement proposal. You will receives one signed copy back from us.

We hope that the information helped you.

We are always available to answer your questions.

Best Regards,
ProLitteris

[signature illegible]

Franziska Eberhard
Vize Director

Translator note: URG = Urheberrechtsgesetz = copyright law

Reprography Agreement

between

Via Marketing & Promotion SA, Via Privata, Sommaruga 21F, 6900 Lugano

- in the following called "Documentation Supply Service"

and

ProLitteris, Schweizerische Urheberrechtsgesellschaft für Literatur und bildende Kunst, Universitätstrasse 96, 8006 Zürich,

- in the following called "ProLitteris"

1 Agreement

ProLitteris licences with this agreement to the Documentation Supply Service the right to copy copyrighted works using their copying equipment (photo copiers, fax equipment, laser printers).

Via Marketing & Promotion SA, Documentation Supply Service, agrees in accordance with Ziffer 6.3.25 des Gemeinsamen Tarifs 8/VI [item 6.3.25 of the Common Tariff 8/ VI] to pay compensations in accordance with the valid Gemeinsamen Tarif 8/VI [Common Tariff 8/ VI].

2. Scope of the licence

The licence given by ProLitteris covers the following applications:

- legally permissible copying of copyrighted and published works for their own use in accordance with article 19 URG;

- copying of copyrighted and published fine arts works for their own use in accordance with article 19 URG paragraph 1 lit. b) and c) and article 19, 2 URG;

- copying of graphical recording of music works (music notes) for their own use in accordance with article 19 URG paragraph 1 lit. b) and c) and article 19, 2 URG;

- copying and free distribution of copyrighted and published works outside their own use in accordance with article 10 URG paragraph 2 lit. a) and b) URG; (included are also copying and free distribution of published and copyrighted fine arts works);

- copying of newspaper and magazine articles and the free distribution of these copies in accordance with article 10 paragraph 2 lit. a) and b) URG.

The licence covers offering, production and distribution of copies in the territory of Switzerland to beneficiaries in accordance with article 19 paragraph 1 and 2 URG.

3. Excluded applications

Offering, production and distribution of electronic/digital copies on the Internet or through other electronic or digital media (online or offline usage)

- within Switzerland,
- from Switzerland into foreign countries,
- in foreign countries

are not included in the present licence.

An explicit approval of the copyright holder is required for all applications that are not licenced by this contract or by the future Gemeinsamen Tarif 9 [Common Tariff 9]. This is especially true for

- complete copies or almost complete copies of works that are available for sales and

- changing or reworking of the copied works.

4 Payments

The annual payments that have to be paid by the Documentation Supply Service for the use in accordance with item 2 are calculated as follows:

- payment of 3.5 Rappen per copy
- an industry coefficient of 70% and
- the to number of copies made by the Documentation Supply Service for the affected year.

5 Report

The Documentation Supply Service must report the total number of copies to ProLitteris by the end of January for the previous year.

ProLitteris can estimate the numbers and can establish an invoice based on the estimate, if the information requested by ProLitteris is not provided after a written request and additional time.

6 Invoicing

ProLitteris invoices the Documentation Supply Service for the current year based on information provided by them.

The ProLitteris invoices must be paid within 30 days. ProLitteris must send one reminder for invoices due.

7 Release

The Documentation Supply Service is released form payments based on claims by third parties for copies made as part of this agreement for the territory of Switzerland.

Offerings, production and distribution of copies from Switzerland to a foreign country are not covered by the release.

The Documentation Supply Service agrees to refer all claimants directly to ProLitteris and refrain from an agreements with them.

8 Gemeinsamer Tarif 8/VI [Common Tariff 8/VI]

The regulations of the Gemeinsamer Tarif 8/VI [Common Tariff 8/VI] are an integral part of this agreement.

9 Validity period

This agreement becomes effective on 1/1/2001. It can be cancelled by either contract party with a three months notice to the end of the year.

## 10 Jurisdiction

The courts in Zürich have jurisdiction for complaints by the Documentation Supply Service against ProLitteris.

The courts in Zürich also have jurisdiction for complaints ProLitteris against the Documentation Supply Service.

Zürich, date.............................    ........................., date.....................


....................................    ..................................................
ProLitteris                              Via Marketing & Promotion SA

Translator note: URG = Urheberrechtsgesetz = copyright law

Hess – Streuli – Wiget
Attorneys

Dr. jur. Niklaus Wiget
Dr. jur. Magda Streuli-Youssef
Dr. jur. Markus Hess
Dr. oec. publ. Ivo P. Baumgartner*
Dr. jur. Daniel Alder                          ProLitteris
Dr. jur. Brigitte Tanner                       Mrs. Franziska Eberhard
Lic. jur. Peter Schatz LL.M.                   Universitätstrasse 96
* graduated tax expert (not an attorney)       Postfach
                                               8033 Zürich


Zürich June 13, 2000
MS/kp

Synopsis to answer the question of the effect of the reprography permissions in
accordance with article 19 and 20 URG with respect to geography


Dear Mrs. Eberhard,

I refer to our meeting dated April 13, 2000 and summarize in the following the results of
my investigation regarding the effect of the reprography permission of ProLitteris in
accordance with article 19 and 20 URG.

A. Introductory remarks

1. The legal base: Article 19 and 20 URG

The following is a copy of the article 19 paragraph 2 and article 20 paragraph 2 and 4
URG in its original wording to clarify the situation.

Article 19 paragraph 2 URG states:

"Work copies can also be produced by a third party for those who have the legal right to
copies for their own use. A third party can be a library, which makes copiers available to
their users."

Article 20 paragraph 2 URG states:

"Those, who copy works in any way for their own use in accordance with article 19 paragraph 1 letter b or letter c or those who, as a third party, copy works in accordance with article 19 paragraph 2 owe the originator a compensation."

Article 20 paragraph 4 URG states:

"The compensation claims can only be claimed by accredited utilization associations."

B. General

1. The system of legal licence

The reprography laws have their basis in article 19 URG. Article 19 URG requires a legal licence. The system of legal licence permits the copying of copyrighted works, but there is a duty for compensation (article 20 paragraph 2 URG). The compensation claims can only be claimed by accredited utilization associations. The utilization association ProLitteris is responsible for collecting the "reprography rights".

2. Applicability or regional scope of the URG

The Swiss URG (Federal Law about the copyright and associated protection rights dated October 9, 1992) is valid only for the protection of works for the sovereign territory of Switzerland. This is a result of the territorial principle (Katzenberger, in: Schricker, Copyright, 2nd issue Munich 1999, Rdn. 120 ff before §§ 120 ff; Cherpillod, in SIWR II/1, Basel 1995, page 37; ZR 97 (1998) No. 112, page 293 ff. = sic! 1999, page 138 ff.).

The territorial principle limits the scope of a protection right to the particular country. The reservation of international law in article 1 paragraph 2 URG does in my opinion not change this. Neither RBÜ, WUA nor TRIPS have different regulations.

The activities of ProLitteris, which have their basis in the URG for the community utilization duty area, are based only on rights in Switzerland and cover only legal concessions for Switzerland. This means that the effect of a reprography permission is solely limited to the territory of Switzerland. ProLitteris can licence a documentation service only for the production of copies in Switzerland and only for distribution of the copies to customers in Switzerland (= users). The copies produced on the basis of the copying permission by ProLitteris can only be offered and distributed in Switzerland. Offering, distributing and sending the copies abroad (also through the Internet) is not covered by the copying permission of ProLitteris. It is decisive for the connection to the Swiss law, that the copying and the use of the work is done in Switzerland.

This means that the copying permission of ProLitteris does not cover those copies that are produced in Switzerland and used abroad. This can be summarized as follows: copies for the use in Switzerland have to be licensed by ProLitteris, while copies for use abroad cannot be licensed by ProLitteris.

It should be noted in this context that reciprocity agreements, which have been established with subsidiaries abroad, do not permit more rights than those that are valid on Swiss territory.

3. The importance of article 19 and 20 URG

The phrase "those who have the legal right to copies for their own use" of article 20 paragraph 2 URG means "those who have the legal right to copies for their own use according to Swiss law". The fact, that the compensation duty of article 20 paragraph 2

URG, is explicitly connected to the permission to copy in article 19 URG is another indicator, that the permission means the legal licence in article 19 URG, which is only valid in Switzerland. Those, who have the right to copy for their own use are therefore defined by the Swiss law.

The territorial principle is also valid here, and it follows, that the protection based on URG is valid for the territory of Switzerland and is limited geographically to Switzerland. The effect of the Swiss URG is only deployed for the territory of Switzerland, which means that the permission given by the law in article 19 URG, and therefore also the reprography permission, is only valid for Switzerland. This means also, that only users with a residence and an occupation in Switzerland can invoke the personal use of article 19 URG. Third parties in terms of article 19 paragraph 2 URG are only documentation services with headquarter and activity in Switzerland.

An expression of the territorial principle is also the regulation of article 20 paragraph 4 URG. It requires that the compensation claims in accordance with article 20 paragraph 2 URG can only be claimed by accredited utilization associations. Accredited utilization associations in accordance with article 42 paragraphs 1 lit. a URG, which were founded in accordance with Swiss law, are associations which have their headquarter in Switzerland and are executing their business from Switzerland. The principle of territory "which dominates the collective use of copyrights globally" is anchored with article 2 paragraph 1 lit. a URG according to Barrelet/Egloff (das neue Urheberrecht [The new copyright law], Bern 1994, N 3 to article 42 URG).

This is finally also part of the permission given by the Eidgenössiches Institut für Geistiges Eigentum [Federal Institute for Intellectual Property] dated May 26, 1998 (see SHAB No. 103 dated June 2, 1998), which refers to the permission of ProLitteris to collect the claims in accordance with article 13, 20 and 22 URG and therefore the collection of claims in accordance with Swiss law.

4. Proposal through the Internet

A list of works on a web site is not a copyrighted use, which means it is not a copy, as long as the works themselves are not shown on the screen. The operation is insofar unobjectionable.

I must, however, voice a reservation. This is in regards to the offer to send copies abroad.

Even if a list of works on a web site has been uploaded in Switzerland or from Switzerland, such an offer on a web site can under certain circumstances qualify as an offer to a foreign country, because it can be called up everywhere in the world on the world wide web.

Circumstance, which have to be considered for the determination of the geographical reach of an offer, include:

the intended use or nature of the offer: an offer for a fast deteriorating product or for a food delivery service is more often than not a local business. The offer of a documentation service is not necessarily a purely national business. It is therefore the responsibility of the supplier to ensure, that orders from abroad (which means orders, for which the legally relevant use is abroad) are not fulfilled;

the internet address of the supplier: a Top Level Domain of ".ch" (contrary to the Top Level Domain of ".com") can be an indicator for a focus on the swiss market only;

The currency which is used for pricing. It can be an indication for only a local (national) coverage of an offer, if the prices are only shown in Swiss Franks.

C. Assessment of cross-border legal violations

I found an indication at Katzenberger (Kommentar [commentary] Schricker. Rdn. 136 before §§ 120 ff), which basically refers to our question. Katzenberger explains that the autonomy of the copying law means, that a violation of this law can also be assumed, if the copying of protected works are done nationally with the intention to export the copied pieces abroad and to distribute them there, which means if the user is abroad.

I hope that my explanations help. I am available if you have questions.

Best Regards.

[signature illegible]

Dr. Magda Streuli-Youssef

Translator note: URG = Urheberrechtsgesetz = copyright law

**Von:** Robert Th. Gmelig Meyling <r.meyling@actamed.ch>
**An:** eberhard@prolitteris.ch <eberhard@prolitteris.ch>
**Datum:** Donnerstag, 24. August 2000 11:49
**Betreff:** Frist ReproVertrag

Sehr geehrte Frau Eberhard,

In Anschluss auf unser Brief vom 16. August und Ihr e-mail vom 21. August
erleutere ich hierbei nochmals die Grunden warum die Fristverlaengerung um
ein Jahr, also bis 31.12.2001, fuer uns unbedingt notwendig ist:

1. Die Reprovertraege zwisschen VMP und Prolitteris haben immer alle
autorenhonorare ueber alle von uns hergestellte Kopien , die in der
Schweiz und ins Ausland geliefert werden, geregelt. Das Hauptteil dessen
Kopien ist immer ins Ausland geliefert worden.
Auch der Hauptumsatz unser Services ist aus dem Ausland.

2. Auch wegen die Bedingung dass alle von uns herrgestellte Kopien ind der
Schweiz hergestellt werden muessen, haben wir nur in der Schweiz ein Sitz
wo circa 25 Menschen taetig sind.

3. Im Falle dass das Reprovertrag fruehzeitig gekuendigt werd, oder sich
nur auf der Schweiz beschraenkt, haben wir keine moeglichkeit mehr
Autorenhonorare fuer von uns hergestellte und ins Ausland gelieferte Kopien
zu bezahlen. Da wir dann rechtswidrig taetig sein werden, sind wir
gezwungen unsere taetigkeiten ins Ausland einzustellen. Wir haben aber mit
unsere Kunden (Pharma-unternehmen) mehr-jaehrige Vertraege, die wir nicht
leicht und einseitig kuendigen koennen. Wahrscheinlich werden sie uns um
Schadenersatz bitten.
Ausserdem werden wir enorm an Einnahmen einbussen, was zu Folge hat dass
wir entweder unsere Aktivitaet ganz einstellen muessen , oder sehr
beschraenken, wass heisst das wir ca, 20 Leute entlassen muessen.

4. Wie waehrend unsere Gespraeche deutlich geworden ist, sind sowol
Prolitteris als VMP daran interessiert ein neuer Vertrag aus zu arbeiten.
Da es unmoeglich ist dass kurzfristig zu realisieren und um grossen Schaden
zu vermeiden , haben wir besprochen das Vertrag was heute noch in Kraft
ist, mindestens bis ende naechstes Jahr zu verlaengern, damit wir beiden
genuegend Zeit haben die Einzelheiten eines neuen Vertrags zu definieren.

Wie Sie uns am 8. August schon telefonisch mitgeteilt haben, ist
Prolitteris einverstanden mit diese Fristverlaengerung.
Ich bitte Sie uns das auch schriftlich zu bestaetigen.

Mit freundlichen Gruessen,

Robert Th. Gmelig Meyling

------

25.08.00

Robert Th. Gmelig Meyling
President & CEO
e-mail: r.meyling@actamed.ch
Phone: 0041 91 9931177

http://www.actamed.ch

25.08.00

Page 1 of 2

**From:**   Robert Th. Gmelig Meyling r.meyling@actamed.ch
**To:**      eberhard@prolitteris.ch <eberhard@prolitteris.ch>
**Date:**    Thursday, August 24, 2000  11:49
**Subject:** Repro Agreement Deadline

---

Dear Ms. Eberhard:

Pursuant to our letter of August 16 and your email of August 21 I will hereby explain to you once again the reasons why an extension of the deadline by one year, i.e. to 12/31/2001, is absolutely necessary for us:

1. The Repro Agreements by and between VMP and Prolitteris have always regulated all author's fees for all copies manufactured by us that are distributed in Switzerland and abroad. The majority of those copies have always been distributed abroad.
Also, the majority of the sales of our service are realized abroad.

2. Also, due to the condition that all copies manufactured by us be made in Switzerland, we are domiciled only in Switzerland where 25 people are employed.

3. In the event that the Repro Agreement is terminated prematurely or is limited to Switzerland only, we will no longer have the possibility of paying author's fees for copies manufactured by us and distributed abroad. Since we will then be acting illegally, we will be forced to discontinue our exporting activities to foreign countries. But we have multi-year agreements with our clients (pharmacological companies) that we can not cancel easily and unilaterally. They will probably ask us for damages.
In addition, we will lose enormous amounts of revenue which will result in our having to either completely discontinue or drastically limit our activities, which will mean that we will have to dismiss approximately 20 people.

4. As has become clear during our talks, Prolitteris as well as VMP are interested in drawing up a new contract. Since it is impossible to realize that in the short term, and in order to avoid any major damages, we have discussed extending the agreement that is still in force today until the end of next year to give us both sufficient time to define the details of a new contract.

As you advised us on August 08 by telephone, Prolitteris has agreed to such an extension of the deadline.
I am asking you to confirm this to us in writing.

With friendly regards,

Robert Th. Gmelig Meyling

-------
08/25/00

Robert Th. Gmelig Meyling
President & CEO
Email:  r.meyling@actamed.ch
Phone:  0041 91 9931177


http://www.actamed.ch
------